(No. 56831.—

DIXON ASSOCIATION FOR RETARDED CITIZENS *et al.*, Appellees, v. JAMES R. THOMPSON, Governor, *et al.*, Appellants.

*Announced June 29, 1982.—Opinion filed August 20, 1982.*

Samuel K. Skinner, of Chicago, Special Assistant Attorney General (William F. Conlon, Jeffrey R. Tone, and Richard J. O'Brien, Jr., of Sidley & Austin, of counsel), for appellants.

Jerome F. Goldberg and Patrick T. Murphy, of Chicago, for the Dixon Association for Retarded Citizens *et al.*, appellees.

Roger B. Derstine, Linda S. Ganski, Gerard A. Brost, and Patricia Kenaga, of Chicago, for the Guardianship and Advocacy Commission *et al.*, appellees.

CHIEF JUSTICE RYAN delivered the opinion of the court:

Plaintiffs, the Dixon Association for Retarded Citizens, whose members consist of parents and guardians of residents at the Dixon Developmental Center, and two individual residents at that institution, by their guardians, commenced this action by filing a complaint for declaratory judgment and injunctive relief against the defendants, James R. Thompson, the Governor of the State of Illinois, and Ivan Pavkovic, the Director of the

Department of Mental Health and Developmental Disabilities (hereinafter referred to as Department). Thereafter, the office of State Guardian of the Guardianship and Advocacy Commission intervened as party plaintiff on behalf of 224 Dixon residents. The complaint sought to enjoin the defendants from implementing their announced intention to close the Dixon Developmental Center (hereinafter referred to as Dixon). Following some preliminary matters not germane to this case, the circuit court of Cook County conducted an extensive hearing and issued a preliminary injunction enjoining the defendants from implementing their plan for the closure of Dixon, including any transfer of the residents or layoffs or transfers of personnel until further order of the court. The circuit court found that the proposed transfers may be in violation of the statutory rights of the plaintiff class to adequate and humane care and services under section 2—102(a) of the Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1981, ch. 91½, par. 2—102(a)) and the transfer procedures set forth in section 4—707 (Ill. Rev. Stat. 1981, ch. 91½, par. 4—707). The defendants filed a notice of interlocutory appeal pursuant to Rule 307(a)(1) (73 Ill. 2d R. 307(a)(1)), and we granted their motion to transfer the appeal to this court pursuant to Rule 302(b) (73 Ill. 2d R. 302(b)). In order to accommodate the litigants, the court set an expedited briefing schedule and had a special setting of the case for oral argument. Thereafter, on June 29, 1982, we entered our order reversing the trial court and stated that a written opinion would follow. In this opinion we set forth the reasons for our decision.

Plaintiffs commenced this action on November 24, 1981, by filing their initial complaint for relief against the defendants, alleging in substance that the defendants proposed to close the Dixon facility and to transfer its predominantly severely and profoundly retarded resi-

dents in violation of certain provisions of the Mental Health and Developmental Disabilities Code, including sections 2—102(a) and 4—707 (Ill. Rev. Stat. 1981, ch. 91½, pars. 2—102(a), 4—707). The complaint also alleged that the proposed closure and transfer of residents would be in violation of the residents' constitutional due process rights. The complaint was amended to allege violation of the residents' eighth amendment right to be free from cruel and unusual punishment. The trial court's ruling was based solely on the statutory provisions. We need not address alleged violations of the residents' constitutional rights, other than to say that the statutory rights granted under the Code are more expansive than and include the constitutional rights of the Dixon residents. See *Youngberg v. Romeo* (1982), 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452; Ill. Rev. Stat. 1981, ch. 91½, par. 2—100.

On February 23, 1982, pursuant to plaintiffs' motion, the court entered a temporary restraining order prohibiting the defendants from implementing their decision to close Dixon. The temporary restraining order is not before this court but was appealed to the appellate court.

On April 19, 1982, the trial court certified this cause as a class action and designated the named plaintiffs as representative members of that class. On April 19, 1982, the court also commenced an evidentiary hearing on the plaintiffs' motion for a preliminary injunction. The hearing concluded on May 10, 1982.

On June 3, 1982, the circuit court entered a preliminary injunction in the form of a memorandum opinion and order. The injunction enjoined and restrained defendants from any further implementation of their announced closure of Dixon. The effect of the injunction was to prevent the closing of Dixon, including the transfer of residents and the layoff or transfer of Dixon employees, because the judge believed that to do so might

violate the residents' right to "adequate and humane care and services" guaranteed by section 2—102(a) (Ill. Rev. Stat. 1981, ch. 91½, par. 2—102(a)) and the transfer standards in section 4—707 (Ill. Rev. Stat. 1981, ch. 91½, par. 4—707). As noted above, the defendants appealed from this interlocutory order pursuant to Rule 307(a)(1) (73 Ill. 2d R. 307(a)(1)), and we granted the motion to transfer the appeal directly to this court pursuant to Rule 302(b) (73 Ill. 2d R. 302(b)).

The plaintiffs and intervenors seek to limit the role of this court on review to the traditional role of a reviewing court considering an appeal from an order granting a preliminary injunction. Thus, it is argued that the granting of the preliminary injunction was within the sound discretion of the trial court and that a court of review should determine only whether or not there was an abuse of that discretion. (See *Lonergan v. Crucible Steel Co. of America* (1967), 37 Ill. 2d 599.) The plaintiffs also argue that the primary purpose of interlocutory injunctive relief is to preserve the *status quo* until there can be a determination on the merits of the controversy. (See *Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 761.) The appellate court, in *City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, summarized the role of the preliminary injunction and the nature of the review on appeal from an order issuing such an injunction when it stated:

> "It is well established that a hearing on a motion for a preliminary injunction does not determine any factual issue. A preliminary injunction is issued to preserve the *status quo* until the trial court may consider the merits of the case. In ruling on a motion for such relief, controverted facts or the merits of the case *are not decided.* In reviewing the discretion exercised by the trial court, an appellate court may decide only whether the petitioner has demonstrated a *prima facie* case that there is a fair question as to the existence of the rights claimed; that the circumstances lead to a reasonable belief that they

probably will be entitled to the relief sought, if the evidence sustains the allegations of the petition; and that matters should be kept in *status quo* until the case can be decided on its merits. In sum, the only question before us is whether there was a sufficient showing to sustain the order of the trial court. [Citation.]" *City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, 432-33.

In this case we do not feel limited by the traditional scope of review of an order issuing a preliminary injunction. Although the order in this case purports to be a preliminary injunction and many references are made in the order to the fact that the court is only preserving the *status quo* until there can be a hearing on the merits, this order is, in effect, a decision on the merits of the case. It should be noted that the transcript of the hearing on the motion for the preliminary injunction is in excess of 4,000 pages. Approximately 28 witnesses testified, and more than 80 exhibits were introduced. The hearing lasted approximately 15 days. The court's order found that the proposed relocation of the residents of Dixon, as set forth in the defendants' plan, would result in a violation of the statutory requirement that the residents must be provided with adequate and humane care and services (Ill. Rev. Stat. 1981, ch. 91½, par. 2—102(a)), and their statutory right to be transferred to a facility that is appropriate and consistent with their habilitation needs (Ill. Rev. Stat. 1981, ch. 91½, par. 4—707). The injunction enjoined the defendants' proposed closure of Dixon and transfer of residents and layoff and transfer of staff "until defendants, at an evidentiary hearing on the merits of this cause can persuade the court that such transfers and layoffs should proceed." Thus, at the proposed evidentiary hearing on the merits, the burden will not be on the plaintiffs to establish the invalidity of the defendants' proposed plan of relocation of residents and staff. The effect of the order is to hold the proposed plan invalid, and it placed the burden on the

defendants to come forth with a plan acceptable to the court. The court then went on to criticize the proposed plan of the defendants and stated, "What we have here, at this point in time, is a plan (4-Level Plan) which purports to be noble in purpose, but will be void of content until there is a sincere, conscientious and sensitive implementation of adequate planning that is not tethered slavishly to short budget deadlines that demand precipitous actions." This clearly reveals a complete rejection of the defendants' relocation plan, and as noted previously, the order has enjoined the transfer, not temporarily pending the disposition of the case, but until the defendants present a different plan acceptable to the judge.

Neither the plaintiffs nor the intervenors contend that the Governor and the Department do not have the power or authority to close Dixon. The only question is whether the proposed closure and relocation of the residents at Dixon violate any rights of those residents.

The trial court based its holding on two sections of the Code. It found that the proposed plan for relocating the residents of Dixon violated the transfer standards set forth in section 4—707 of the Code (Ill. Rev. Stat. 1981, ch. 91½, par. 4—707). That section provides that the director of any facility "may transfer a client to another Department facility if he determines that the transfer is appropriate and consistent with the habilitation needs of the client." (Ill. Rev. Stat. 1981, ch. 91½, par. 4—707.) The court also found that the proposed plan violates section 2—102(a) of the Code (Ill. Rev. Stat. 1981, ch. 91½, par. 2—102(a)). That issue will be addressed later. Also, the proposed relocation plan, which the court found to be in violation of these sections of the Code, will be more specifically set forth later in this opinion.

A reading of article VII of chapter 4 of the Code (Ill. Rev. Stat. 1981, ch. 91½, par. 4—700 et seq.) reveals that these provisions do not apply to the relocation of clients of

a facility when that facility is to be closed. The provisions of article VII can apply only to transfers between existing facilities.

Whenever a transfer is to be made under section 4—707, the resident, his attorney, parent, or guardian are entitled to notice of the transfer and the reason for the transfer. (Ill. Rev. Stat. 1981, ch. 91½, par. 4—709.) A client or the person who receives the above notice is entitled to object to the transfer, and if an objection is filed, then the client is entitled to a hearing by a utilization-review committee. (Ill. Rev. Stat. 1981, ch. 91½, pars. 4—707, 4—709.) The Department has the burden of proving that the transfer is "appropriate and consistent with the habilitation needs of the client." (Ill. Rev. Stat. 1981, ch. 91½, pars. 4—707, 4—709.) The review committee may recommend that the resident be transferred or not transferred. (Ill. Rev. Stat. 1981, ch. 91½, par. 4—709.) Certain review provisions are provided for the various findings and determinations. Ill. Rev. Stat. 1981, ch. 91½, par. 4—209(c); Ill. Rev. Stat. 1981, ch. 91½, par. 6—101.

Implicit in the transfer procedures in article VII is the conclusion that the transferring facility must remain open after the decision to transfer a resident is made. The procedures outlined in article VII permit the rejection and reversal at various stages of review of a decision to transfer a client to another facility. Such a reversal or rejection of a transfer determination is not consistent with the closing of the facility from which the transfer is made. The application of the provisions of article VII to a facility that is to be closed could compel the continued operation of that facility and the maintenance of its staff at a great expense to accommodate the few clients whose transfers may not be appropriate under the standards of section 4—700 *et seq.* Article VII of chapter 4 of the Code is silent as to the procedures to be followed in the event the facility from which the transfers are to be made is to be closed and clearly

cannot be made applicable to such a case.

In *Bell v. Thornburgh* (1980), 491 Pa. 263, 420 A.2d 443, the Supreme Court of Pennsylvania reached a similar conclusion. That court held that the statutory right of a resident at a mental health facility to transfer to another facility only upon his written consent would not apply when the facility was to be closed. The court stated:

> "Applying these principles of statutory construction, and a little common sense, it is apparent the legislature did not intend section 207 of the Act to be used as a bar to the closing of a particular institution. \*\*\* Appellees' interpretation of section 207 would lead to the unreasonable result that a few patients could, by withholding their consent to transfer, prevent the closing of a particular facility which had been deemed unsafe, uneconomical and unnecessary by those who are charged with the responsibility to make such decisions \*\*\*." *Bell v. Thornburgh* (1980), 491 Pa. 263, 270, 420 A.2d 443, 446.

As noted, the Code is silent as to the procedures to be followed in the relocation of clients of a facility that is to be closed. It is, therefore, incumbent upon the Department to establish procedures for relocating the clients of a closed facility. In formulating such procedures, consideration must be given to the statutory and constitutional rights of the transferees. Plaintiffs argued and, as noted earlier, the trial court found that the four-phase plan of the defendants to be used in relocating Dixon clients violated section 2—102(a) of the Code (Ill. Rev. Stat. 1981, ch. 91½, par. 2—102(a)), which provides:

> "A recipient of services shall be provided with adequate and humane care and services in the least restrictive environment, pursuant to an individual services plan \*\*\*." (Ill. Rev. Stat. 1981, ch. 91½, par. 2—102(a).)

The defendants agree that the relocation must be in compliance with section 2—102(a), but state that their four-phase plan to relocate the residents is in compliance with supplying the residents with adequate and humane care and services. Furthermore, defendants assert that Dixon is

an outdated facility, costly to maintain, and that it does not provide the homelike, normalized environment in keeping with the national and State trends for the service of the retarded.

The circuit court concluded that the proposed transfer of the residents would violate section 2—102(a) in that (a) the defendants' timetable of eight to nine months for completing the transfer is unrealistic; (b) the transfers will likely result in serious harm to some or all of the residents; (c) defendants have not properly planned such transfers, which lack appropriate review of individual habilitation needs of each resident; and (d) some of the receiving facilities are not currently prepared to accept the residents to be transferred and some are not yet operational.

What constitutes "adequate and humane care and services" is not specifically defined in the Code. However, section 1—115 states that "services" means "treatment or habilitation." (Ill. Rev. Stat. 1981, ch. 91½, par. 1—115.) "Habilitation" is defined in section 1—111 as follows:

> "[A]n effort directed toward the alleviation of a developmental disability or toward increasing a developmentally disabled person's level of physical, mental, social or economic functioning. Habilitation may include, but is not limited to, diagnosis, evaluation, medical services, residential care, day care, special living arrangements, training, education, sheltered employment, protective services, counseling and other services provided to developmentally disabled persons by developmental disabilities facilities." (Ill. Rev. Stat. 1981, ch. 91½, par. 1—111.)

Thus, adequate and humane care and service would seem to include the care or service encompassed within the definition of "habilitation." For the care and service to be adequate, it would appear that they must also conform to the requirements of the Code that no recipient of service shall be deprived of any rights, benefits or privileges guaranteed by the Constitution of the State of Illinois or the Constitution of the United States. Ill. Rev. Stat. 1981, ch. 91½,

par. 2—100.

The Supreme Court has recently addressed the question of the constitutional rights of one confined to a mental institution. In *Youngberg v. Romeo* (1982), 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452, the Supreme Court held that the mentally retarded who are involuntarily committed have constitutionally protected liberty rights, under the due process clause of the fourteenth amendment, to reasonably safe conditions of confinement, freedom from unreasonable bodily restraints, and such minimally adequate training or *habilitation* as reasonably may be required by these interests. In *Youngberg* the State conceded that the respondent had a right to adequate food, shelter, clothing, and medical care. Thus, we find that adequate "habilitation" is included among the constitutional rights of those involuntarily confined to mental institutions as well as being a right conferred by section 2—102(a) of the Code. The Supreme Court in *Youngberg* noted that the basic requirement of *adequacy* may be stated as that training which is reasonable in light of identifiable liberty interests and the circumstances of the case. It would appear that the constitutional rights of these residents as discussed in *Youngberg* essentially overlap the rights conferred by section 2—102(a). The adequacy of the care and services required by that section and the Constitution is that which is reasonable in light of identifiable liberty interests and the circumstances of the case.

We have heretofore referred to the defendants' four-phase plan for relocating the residents of Dixon without specifying what it provides. We do so now. Initial planning in the development of this plan focused on three areas: (1) identifying the area of the State from which the residents were initially placed at Dixon; (2) identifying special needs of the resident groups at Dixon; and (3) determining the capability of other Department facilities to serve additional residents. The initial planning was completed with the as-

sistance of seven task forces: (1) resident assessment, grouping and transferring; (2) equipment identification; (3) facilities certification, assessment, and compliance; (4) budgetary and fiscal control; (5) personnel coordination and employee relocation; (6) location and securing physical plant to serve special need groups; and (7) communication with interest groups.

Eight facilities were identified as potential receiving facilities for Dixon residents. Thereafter, a particular receiving facility was tentatively identified for each resident based on the proximity of the facility to the resident's family or guardian, the availability of special programs to fit the resident's habilitation needs, and the overall capability of the facility to meet those needs.

After the receiving facilities were identified, the Department of Public Health surveyed the facility to determine additional bed capacity under applicable certification standards. Also, the plan for the closure of Dixon and the relocation of its residents was presented to a number of public interest groups for review and comment.

The actual transfer of each resident is to be made in accordance with the four-level or four-phase program. It is this transfer program that the trial court found violated the statutory rights of the residents. The first level consists of notice to the responsible relative or guardian concerning closure, transfer, and the review process. The plan requires all residents to be grouped by level of functioning, age, and ambulation. A tentative assignment is made to a specific program or particular facility to best meet the resident's program needs. Geographic ties to relatives, significant friendships, and customary daily routine are to be considered critical factors in each resident's placement.

At the second level, a habilitation team from the receiving facility is to assess individuals tentatively assigned to their facility to determine if the individual's program needs can be met at the receiving facility. That group is

then to confirm the appropriateness of the individual for the facility and develop a habilitation plan. The development of a habilitation program is to assure that the receiving facility will be familiar with the resident's needs and can provide the appropriate program. The parent or guardian is then to be notified of a transfer conference.

The third level consists of a meeting with the parent or guardian, the resident, if appropriate, and the habilitation teams from Dixon and the receiving facility. The habilitation plan is to be presented to and discussed with the parent or guardian, and they are to be given an opportunity to raise objections or concerns with regard to the plan. The staff is to resolve all the problems raised and then is to communicate the final habilitation plan to the parent or guardian. If the plan is agreed to, the transfer will be scheduled. If there are objections, however, the relocation of the resident is to proceed to the fourth level of the Department's process.

The fourth level, the relative- or guardian-review procedure, consists of a three-member panel which is to hear and consider objections by the parent or guardian, who is also entitled to be present at the review. The procedure requires that the panel jointly confer on each objection and review all relevant data on which the relocation decision is based. The panel has the duty to decide if the habilitation needs of the individual or the plan should be modified. The panel has the authority to modify the transfer plan and to design a new program of transfer. The final requirement is that the decision be communicated to the guardian in writing with the basis for the panel's decision.

At the time oral arguments were heard in this cause the first level had almost been completed and the second level had begun for some residents.

There was testimony at the hearing on the motion for a preliminary injunction that Dixon has trouble maintaining an adequate level of professional staff—physical therapists,

speech pathologists, activity therapists and psychologists; and that Dixon is an older facility built to accommodate 4,000 to 5,000 residents, not the 886 that currently live there.

The constitution of this State provides that the Governor shall have the supreme executive power and shall be responsible for the faithful execution of the law. (Ill. Const. 1970, art. V, sec. 8.) Also, the statutes vest in the Department of Mental Health and Developmental Disabilities the duty and authority to administer the provisions of the Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1981, ch. 127, par. 53) and to exercise executive and administrative supervision over all *institutions, divisions, programs,* and *services* under the jurisdiction of the Department (Ill. Rev. Stat. 1981, ch. 91½, par. 100—4). The authority of the executive branch of State government to close Dixon has not been questioned. Devising the plan or program for relocating the residents of Dixon after its closure clearly falls within the ambit of the statutory authority granted to the Department and the constitutional authority of the Governor as chief executive officer of the State. The question we must determine is whether the order of the trial court unlawfully usurped the authority that has been conferred upon these members of the executive branch of government. We hold that it has usurped that authority.

It is within the realm of judicial authority to assure that the action of the members of the executive branch does not deprive the residents of an institution of rights conferred by statute or by the Constitution. However, under the guise of protecting these rights a court may not substitute its idea of what is best for the residents in lieu of the program devised by those who are vested with the authority and duty to provide care and services. Obviously, there will be differences of opinion even among professionals as to the care, services, and treatment that should be

provided. This is particularly true in the sensitive area of providing care and services for unfortunate individuals such as those with whom this case deals. The evidence presented to the court does not indicate a precipitous, unplanned closing and transfer of the residents at Dixon as the trial court intimated. Rather the evidence indicates that there was detailed, considered planning for the closing of this facility and that there was a sincere attempt to develop a program for relocating the residents in a manner that would accommodate the residents' individual needs. That some of the professionals who testified in the hearing disagree with the program developed by the Department does not warrant judicial interference. Those who devised the relocation plan and those who will administer it are qualified professionals whom the law vested with the authority to make such decisions. We must accept their decisions as presumptively valid.

In *Youngberg*, the Supreme Court stated:

"[W]e emphasize that courts must show deference to the judgment exercised by a qualified professional. By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized. Moreover, there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions." (*Youngberg v. Romeo* (1982), 457 U.S. 307, 322, 73 L. Ed. 2d 28, 41-42, 102 S. Ct. 2452, 2461-62.)

(See also *Parham v. J.R.* (1979), 442 U.S. 584, 61 L. Ed. 2d 101, 99 S. Ct. 2493.) *Youngberg* involved an action for damages by a mentally retarded resident of a State institution. The Supreme Court, after the portion of the opinion quoted above, and after noting that courts should not second-guess expert administrators on matters in which they are better informed, stated:

"For these reasons, the decision, if made by a professional, is presumptively valid; liability may be imposed

*only when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."* (Emphasis added.) 457 U.S. 307, 323, 73 L. Ed. 2d 28, 42, 102 S. Ct. 2452, 2462.)

Similar consideration of and deference to the professional judgment exercised in our case is appropriate. The four-level relocation program was devised after careful and detailed studies which covered a wide range of concerns. The relocation program was designed by professionals who, in the performance of their statutory duties, had exercised their professional judgment. Although other professionals may disagree with the decisions that were made, the court should not interfere unless it can be said that the program designed is "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person[s] responsible actually did not base the decision" on their professional judgment. (457 U.S. 307, 323, 73 L. Ed. 2d 28, 42, 102 S. Ct. 2452, 2462.) Measuring the four-level relocation program against this criteria we must conclude that the trial court erred in enjoining its implementation.

For the reasons herein stated we reverse the order of the circuit court of Cook County.

*Order reversed.*