190 F.3d 784 (7th Cir. 1999)
 Mollie King, et al., Plaintiffs-Appellees,
v.
Joan Walters, Director, Illinois Department of Public Aid, and Dianna Durham-McLoud, Administrator, Division of Child Support Enforcement of the Illinois Department of Public Aid, Defendants-Appellants.
 No. 98-2086
 United States Court of Appeals, Seventh Circuit
 Argued February 17, 1999
Decided September 1, 1999
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 92 C 1564--George W. Lindberg, Judge.
 Before Cudahy, Coffey, and Diane P. Wood, Circuit Judges.
 Diane P. Wood, Circuit Judge.
 
 
 1
 According to the plaintiffs, this case presents the question whether the State of Illinois can be held to its word to a federal district court, when the state sends an agency official to the court in response to an order to present a person with authority to settle a case and indicates the official is such a person; the state defendants see it as a case about the propriety of imposing upon the state a consent decree to which it never truly consented. At bottom, the litigation concerns the child custody enforcement program Illinois has established under Title IV-D of the Social Security Act, 42 U.S.C. sec. 651 et seq. At this stage, however, the merits are largely beside the point. Instead, we must decide whether the district court was justified in its decision to enter judgment in accordance with a consent decree negotiated by the parties, but which the state attempted to repudiate at the eleventh hour. We conclude that further proceedings in the district court are necessary before we can decide whether the decree was properly entered, and we therefore remand the case for that purpose.
 
 
 2
 * The only way to understand why the district judge acted as he did with regard to this consent decree is to review in some detail the tortuous course of this litigation. It began as a class action brought by plaintiffs, who are beneficiaries of child support orders and their custodial parents residing in Cook County, Illinois, and who are receiving neither the total amount of child support payments due to them nor the child support enforcement services from the State of Illinois required by federal law. The defendants (to whom we refer collectively as "the state") are the state officials responsible for administering Illinois' child support enforcement program: the Director of the Illinois Department of Public Aid ("IDPA") and the Administrator of IDPA's Division of Child Support Enforcement ("DCSE"). The plaintiffs filed their initial complaint on March 3, 1992, seeking declaratory and injunctive relief under sec. 1983 to redress the state's alleged failure to establish child support enforcement programs meeting the requirements of Title IV-D. On August 6, 1992, the court dismissed that complaint for reasons that are not important here, but it granted the plaintiffs leave to file an amended version by September 2, 1993--a deadline that was eventually extended until April 29, 1994.
 
 
 3
 At that point, both sides became interested in pursuing a settlement. In time, however, those early negotiations stalled. The plaintiffs therefore moved to reinstate the case on April 26, 1994, and they filed a second amended complaint on May 23, 1994. Over the next several months, the second amended complaint survived a series of challenges from the state; the court granted the plaintiffs' request for class certification; and the parties worked out a schedule for discovery. Then, (another two years later!) on April 2, 1996, the trial preparations once again came to a halt when the parties informed the court that they had agreed on a settlement "in principle" and were working on a written document. Based on this announcement, the court dismissed the case with leave to reinstate by July 7, 1996. The court subsequently extended the deadline for reinstatement several times as a bookkeeping device to keep track of the case while the parties negotiated. (We have frowned on this practice, unless it is clear that nothing else will accomplish the desired goal, because it can be confusing, or worse, prejudicial to the rights of the parties. See Otis v. City of Chicago, 29 F.3d 1159, 1163 (7th Cir. 1994) (en banc). In this case, it appears to have been driven by the pressure to improve docket statistics, which is not the kind of valid reason that Otis contemplated.)
 
 
 4
 Almost a year later, while these settlement discussions were dragging along, on April 21, 1997, the Supreme Court decided Blessing v. Freestone, 520 U.S. 329 (1997). In Blessing, the Court held that Title IV-D does not convey a privately enforceable right to have state child custody enforcement programs achieve "substantial compliance" with its requirements. Id. at 343-45. On the other hand, the Court expressly acknowledged the possibility that specific provisions of Title IV-D may give rise to individual rights that, if properly identified in the complaint, could be vindicated by means of sec. 1983. Id. at 345- 46. The obvious relevance of Blessing to the plaintiffs' claim was not lost on either party. Yet the question whether the second amended complaint identified the sort of specific enforceable rights to which the Blessing Court had alluded remained unanswered. Although both the plaintiffs and the state believed that Blessing should be interpreted in their favor, each feared that litigating the issue could lead to the establishment of their opponents' position as precedent.
 
 
 5
 On June 25, 1997, the plaintiffs moved to vacate the most recent dismissal and reinstate the case, even though the applicable deadline for reinstatement had passed. At the hearing on the motion, plaintiffs' counsel explained that the settlement negotiations had gone off-track because of "intervening events," including actions by the state legislature, a change in the state administrative structure, and Blessing. After the court reinstated the case, the Assistant Attorney General ("AAG") appearing on behalf of the state suggested for the first time that the state might be interested in litigating the issues raised by Blessing. That comment prompted the district judge (who noted that the case had been lingering on and off his docket for over five years) to order the parties to return to court on August 6, 1997, so that the court could be informed whether the case was still in a "settlement posture." The court also specifically ordered the state to produce someone with decision making authority who could definitively answer that question.
 
 
 6
 As it turned out, court was not in session on August 6 and the status conference was rescheduled for September 17. Nevertheless, the parties convened on August 6 to discuss where matters stood. Robert Lyons, who was then DCSE's Deputy Administrator and is now DCSE's Administrator, appeared at both the August 6 meeting and the September 17 court date, ostensibly in response to the district judge's request that the state produce someone with authority to settle. On both occasions, Lyons personally indicated that the state still intended to settle and was not interested in litigating the Blessing issue. Indeed, when the district judge expressed his frustration with the case's snail-like pace at the September 17 status hearing, both sides reiterated that they were close to settlement with only a few wrinkles remaining to be ironed out. Skeptical that settlement was in fact imminent, the judge set a trial date for November 3, 1997.
 
 
 7
 With the added pressure of an impending trial date, settlement negotiations intensified. AAG Karen Konieczny, who took over the case from her predecessor prior to the July 25 hearing, represented the state. In addition, approximately six different IDPA officials participated in the negotiations, including most prominently Lyons. John Bouman was the primary negotiator for the plaintiffs. By October 23, 1997, the individuals negotiating on the parties' behalf had resolved their substantive differences and were tweaking the final wording of a written agreement. That day, Bouman called the court to inform it that a settlement had been reached and to have the case removed from the docket. Bouman contends that he placed this call from a meeting at which both Konieczny and Lyons were present, and that they both were aware of and approved the decision. (At oral argument, Konieczny denied any recollection of this meeting and phone call; given our resolution of the case this discrepancy makes no difference.) On October 24, the state sent a draft consent decree to the plaintiffs accompanied by a letter indicating that the Director of the IDPA and the Attorney General still had to sign off on the agreement. Several days later, Bouman responded with suggestions for revising two paragraphs that he felt did not reflect the agreed-upon terms. These minor snags were quickly resolved, however, and the parties arranged to present the decree to the court on November 20, 1997.
 
 
 8
 On the afternoon of November 19, Konieczny sent Bouman a fax indicating that the state no longer supported the consent decree. Indeed, it no longer wanted to settle at all; instead, it wanted to litigate the issues raised by Blessing. This abrupt change in position came at the direction of the Office of the Governor, which had just become aware of the existence of the almost six-year-old lawsuit and contacted Konieczny the previous afternoon. Thus, the focus of the November 20 court date shifted from merely obtaining a stamp of approval from the court to deciding whether the consent decree should be entered over the state's new- found objections. The document presented to the court was signed by the plaintiffs, but not by any representative of the state. The district judge initially favored entry of judgment on the decree, and he scheduled a hearing for the state to show cause why this should not be done. In addition, the court ordered representatives from the Governor's and Attorney General's offices, as well as the Director of the IDPA, to appear at the hearing.
 
 
 9
 At the December 12, 1997, hearing on the order to show cause, the district judge asked the state to explain its sudden change in position. William Ghesquiere, appearing in his capacity as associate counsel to the Governor, replied that he first found out about the lawsuit in late October 1997. For some unspecified amount of time, he explained, the State of Illinois had gradually been moving toward a general policy disfavoring the settlement of class action claims. The Governor and the Attorney General considered the plaintiffs' lawsuit to be particularly ill-suited to settlement because it raised issues that were likely to come up again in the future. Put another way, the Governor (or, more accurately, Ghesquiere himself, as this was his decision) preferred to litigate the outstanding legal issues sooner rather than later, and thus avoid another protracted lawsuit. Ghesquiere argued that it was not too late for the state to change its position because all consent decrees purporting to bind state agencies are subject to the approval of the Governor and the Attorney General, and Lyons lacked the authority to consent on their behalf.
 
 
 10
 The district judge rejected this argument and decided to hold the state to the decree it had negotiated and drafted. The judge relied heavily on the fact that the state itself had represented to the court that Lyons was someone with the authority to make settlement decisions. If he was not in fact such a person, then the state had been misleading the plaintiffs and the court at least since August 1997. In addition, the court noted that (1) the latest round of settlement negotiations was then over a year old and the lawsuit itself had been ongoing since 1992, (2) the state had consented to the removal of the case from the court's docket in anticipation of settlement, and (3) the court had expressly ordered the state to reach a firm decision on whether it wanted to litigate the Blessing issue, and on September 17, 1997, Lyons had informed the court that it did not. The state, in the court's view, should have obtained whatever internal approvals were required no later than that date (which was already some six months after Blessing was decided). Finally, the judge expressed concern that private parties and courts involved in litigation with state agencies would be vulnerable to last-minute surprises whenever the Governor did not personally participate in negotiations or appear before the court. After holding the requisite fairness hearing, the court entered the consent decree.
 
 II
 
 11
 Despite the complicated history of this case, the question before us is relatively straightforward: did the district court abuse its discretion by entering judgment in accordance with the consent decree? See Carr v. Runyon, 89 F.3d 327, 331 (7th Cir. 1996); see also In re VMS Securities Litigation, 103 F.3d 1317, 1321 (7th Cir. 1996); Delaware Valley Citizens' Council for Clean Air v. Pennsylvania, 755 F.2d 38, 41 (3d Cir. 1985). As we have often noted, consent decrees have attributes of both judgments and contracts. See, e.g., In re County Collector of the County of Winnebago, Illinois, 96 F.3d 890, 894 (7th Cir. 1996); Dunn v. Carey, 808 F.2d 555, 559 (7th Cir. 1986). We are concerned here with the contractual nature of these documents. While the imprimatur of judicial approval gives consent decrees the force of law, "it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all." Local 93, International Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 522 (1986); see also Kasper v. Board of Election Comm'rs of the City of Chicago, 814 F.2d 332, 341 (7th Cir. 1987); Dunn, 808 F.2d at 559. Indeed, it hardly makes sense to refer to a document as a "consent" decree when it is based on something other than the parties' voluntary agreement. As a result, generally speaking, a district court abuses its discretion when it enters a consent decree that purports to bind a party that did not agree to the decree's terms. See International Ass'n of Firefighters, 478 U.S. at 529; United States v. Ward Baking Co., 376 U.S. 327, 334 (1964); People Who Care v. Rockford Bd. of Educ. Sch. Dist. 205, 964 F.2d 639, 640 (7th Cir. 1992).
 
 
 12
 The state urges us to find that this is exactly what happened here, when the district court entered the consent decree despite the fact that the only individual it claims was authorized to give consent on behalf of the defendants, i.e. the Governor, refused to do so. It contends that, even though the Governor is not a named defendant, under Illinois law, he is literally the only state official possessing actual authority to bind state executive branch officials under a consent decree. In support of this contention, it cites general language from the Illinois state constitution to the effect that "[t]he Governor shall have the supreme executive power, and shall be responsible for the faithful execution of the laws," Ill. Const. art. 5, sec. 8. It also directs our attention to Dixon Association for Retarded Citizens v. Thompson, 440 N.E.2d 117 (Ill. 1982), in which the Illinois Supreme Court noted that the supreme executive power resides in the Governor's office. Id. at 124. As an alternative argument, it cites Gust K. Newberg, Inc. v. Illinois State Toll Highway, 456 N.E.2d 50 (Ill. 1983), for the proposition that Illinois law requires the Attorney General, acting as general counsel to the executive, to approve any consent decree purporting to bind a state agency.
 
 
 13
 Newberg, however, punches a fairly serious hole in the state's basic argument that no consent decree can bind the State of Illinois unless the Governor personally approves it. It demonstrates that at least one other person in Illinois beside the Governor, at least sometimes, has actual authority to settle cases--the Attorney General. The question is thus who else in addition to the Governor enjoys this kind of actual authority, not whether anyone else exists at all. In the present setting, it is whether Lyons, as DCSE's Deputy Administrator, was such a person or if any other individual who enjoyed actual authority under Illinois law gave her approval to the settlement in a way that was binding. The effectiveness of a consent decree depends on the actual authority of the individual purporting to consent to the compromise, see Morgan v. South Bend Community Sch. Corp., 797 F.2d 471, 478 (7th Cir. 1986), citing United States v. Beebe, 180 U.S. 343, 351-55 (1901). Nevertheless, it does not follow that one and only one person may have actual authority. Even if Ghesquiere was correct, and the Governor of Illinois possesses the final authority to run the state's executive branch, heads of departments normally have the authority to resolve cases on behalf of their own department. The same is true in the federal government: there is no need for the President to sign off on a settlement reached between the Secretary of Transportation and a litigant, even though, as an internal matter, it may be necessary for the Attorney General to do so.
 
 
 14
 We are not persuaded to the contrary by the authorities on which the state relies. While Newberg did hold that the state Attorney General had to approve any settlement agreement arising from transactions entered into by the Illinois State Toll Highway Authority, the holding was based on an interpretation of statutory language addressing that exact topic. See 456 N.E.2d at 54-55. No such statute is present in this case. If anything, this argument favors the plaintiffs, as the relevant statutory provisions grant the authority to "administer" the state's child support enforcement program to the Director of the Department of Public Aid. See 20 ILCS 2205/48a. Similarly, the passage cited by the state from Dixon Association for Retarded Citizens, a case in which the Governor was actually named as a defendant, concerned the allocation of power among the branches of government and the possibility of the judicial branch usurping the executive branch's power to make administrative decisions regarding state programs. See 440 N.E.2d at 124. We fail to see how a broad endorsement of separation of powers principles translates into an express grant exclusively to the Governor of the specific power to approve consent decrees binding the IDPA, and nothing in that case suggests that state law requires the executive branch to follow a particular internal procedure in approving litigation decisions.
 
 
 15
 Up until the time Ghesquiere learned about the case, the record indicates that the highest officials within the IDPA, the "client" that Konieczny represented, had approved the settlement. So, at least, Lyons reported, and he gave the court no reason to believe that he did not have the authority to make this statement, through appropriate delegations of power within his department. This is therefore not a case, contrary to the state's argument, where an AAG on her own authority purports to bind the state, which we agree would be impermissible.
 
 
 16
 Nevertheless, we reluctantly conclude that the factual record necessary for resolving a key legal issue in this case is inadequate. The record simply does not reveal whether Lyons possessed the requisite actual authority to speak for the agency. The state is wrong to think this question irrelevant just because the Governor is the head of the executive branch of state government, and the district court was wrong to assume that estoppel principles entitled it to avoid resolving the matter. The court inferred that one of two things must have happened: either the required consent was obtained and the state was attempting to retract it through dishonest means, or consent was never given even though the state had represented to both the plaintiffs and the court that it had been. Whichever was the true state of affairs, the court thought, it was still too late by October 24, when the state first announced that both the Director of the IDPA and the Attorney General had to sign, for it to repudiate its former position: both the court and the plaintiffs had relied on the state's representations about the authority of its agent to settle to their detriment. See Morgan, 797 F.2d at 478; Portmann v. United States, 674 F.2d 1155, 1158 (7th Cir. 1982).
 
 
 17
 The state's behavior in this case was certainly troublesome, and we do not fault the district judge for reacting with frustration to its tactics. Under the circumstances, however, we have no choice but to remand this case to the district court so that it can make a factual finding on whether Lyons had actual authority to act at the time he indicated approval of the settlement, or, alternatively, if any other official (i.e. the Administrator or the Director) had approved the settlement and had sent Lyons to communicate that fact. If so, then the court was entitled to conclude that the switch in position came too late; but if the agency head (or other person with actual authority) never approved the deal, Morgan requires us to give the state the opportunity to withdraw its consent and to litigate. We add that nothing will prevent the court, should matters require further litigation, from sanctioning the state in other appropriate ways for its failure to produce the required person in response to the court's order. This is a matter we leave to the district judge's discretion on remand.
 
 
 18
 The state itself acknowledges that there was no reason for the plaintiffs or the court to believe that they should treat this consent decree, or the negotiations that produced it, differently from any other. When pressed at oral argument, Konieczny admitted that she knew of no instance in which the Governor had personally signed a consent decree; to the contrary, she informed us that she usually signs such documents herself. Moreover, Konieczny could not point us to a policy statement detailing the procedure for securing the Governor's consent for settlement, nor could she answer whether whatever informal procedures exist produce a paper trail. In short, there is nothing to which the state can point that should have placed the court or the plaintiffs on notice that obtaining the Governor's approval was going to be an issue. Thus, when the state indicated that it remained in a settlement posture, even in light of the ruling in Blessing, the court and plaintiffs appropriately took that representation at face value.
 
 
 19
 In its oral ruling, the district judge stressed that the State of Illinois should not seek or expect special treatment in his courtroom based on its size or complexity. Certainly, when a federal district court judge orders counsel for a large private corporation to appear in her courtroom with a corporate officer who has the authority to settle a case, the judge must assume that the individual who appears in response to that request either possesses such authority herself or has been in communication with those within the corporation who do. We see no reason to expect less of the state. Moreover, we cannot imagine that the state would prefer a different rule. Surely, the state does not intend to call into question the validity of every consent decree involving one of its agencies and signed by an AAG alone.
 
 
 20
 Nonetheless, for the reasons given we now REMAND this case to the district court for further proceedings in accordance with this opinion. Each party is to bear its own costs on appeal.