Willie E. MORGAN, Plaintiff-Appellant,

v.

SOUTH BEND COMMUNITY SCHOOL CORPORATION and James P. Scamman, Defendants-Appellees.

No. 85–2955.

United States Court of Appeals, Seventh Circuit.

Argued May 14, 1986.

Decided July 29, 1986.

Rehearing and Rehearing En Banc Denied Aug. 29, 1986.

LaVeeda Morgan Battle, Montgomery, Ala., for plaintiff-appellant.

Richard W. Morgan, South Bend, Ind., for defendants-appellees.

* The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, sitting by designation.

Before POSNER and EASTERBROOK, Circuit Judges, and CAMPBELL, Senior District Judge.*

EASTERBROOK, Circuit Judge.

In September 1980 a kindergarten student was sexually molested on her way to Perley School in South Bend, Indiana. Dale Fozo, the principal of Perley, neglected to report the incident promptly to the police. The school district held a meeting of all principals to remind them of the steps to be taken, including immediate reports to parents and the police, in the event of sexual incidents. Willie Morgan, the principal of Oliver School, was at the meeting. Within two weeks an eighth grade boy and a seventh grade girl were found having sexual relations in the basement of Oliver School. Morgan was informed almost immediately but told others not to let the news "out of the building". Neither the school district's administration nor the police learned of the event until April 1981. On April 22, 1981, the director of employee relations of the school district reminded Morgan in the strongest terms that he must report sexual incidents immediately. The very next day two Oliver School students were caught in a boy's bathroom immediately after school, apparently engaged in intercourse while other students watched. The school's custodian chased the students away; they went to a nearby garage and took up where they had left off. When Morgan learned of the incident, he told the students that in the future they should leave the building promptly. Only after the school counselor at Oliver School had learned of the incident, and insisted that Morgan call the police, did Morgan notify the administration and the police.

These lapses on Morgan's part led the officials of the school district to conclude that Morgan lacked sound judgment, a requirement for a principal. Morgan, the principal at Oliver since 1975, had been told at the beginning of the 1980–81 school year

that his performance would be monitored closely. (One incident, in which Morgan taped a conversation in his office and replayed it so that others could hear, led to the creation of a special committee to "monitor the staff-principal working relationship at Oliver School in an effort to resolve conflicts and improve staff moral [sic].") During this year of close attention Morgan not only neglected to report the two sexual incidents but also decided to overlook the theft of a basketball backboard at the school. In addition, Morgan allowed the owner of the garage in which the children had continued their escapade of April 23 to question the boy, in private, at the school. Morgan conceded that such private interrogation was against the school district's policy and his own better judgment.

On April 29, when the school district first learned of the April 23 incident, Morgan was suspended with pay. At a meeting on May 1, officials of the school district, including James Scamman, the superintendent of schools, told Morgan that his evaluation for 1980–81 would be negative. Although Morgan had a contract as an administrator through 1981–82, the negative evaluation would make a renewal unlikely. Scamman asked Morgan to accept a reassignment as a classroom teacher in 1981–82, a position in which Morgan would have tenure. Morgan would keep his principal's salary and benefits for 1981–82 but would revert to a teacher's lower pay in the fall of 1982. Morgan later accepted Scamman's proposal. His suspension as principal was lifted. Morgan finished the year as principal of Oliver School and became a classroom teacher.

The school district calls this a "voluntary reassignment". Of the 20 principals identified for close monitoring during the 1980–81 year, four were "voluntarily reassigned" at the end of the year. One of them was Dale Fozo, whose oversight in September 1980 led to the increased sensitivity about sexual misconduct. Three of the four "voluntarily reassigned" principals are white. Morgan is black. He filed this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. §§ 1981 and 1983. The district court held a bench trial and concluded that Morgan had been demoted because of substandard performance rather than race.

I

At the conference the Equal Employment Opportunity Commission held in December 1981 on Morgan's charge of discrimination, the hearing officer proposed a settlement. Scamman, Ralph Komasinski (the Director of Employee Relations), and the board's attorney discussed the proposal among themselves, and Scamman agreed to it. Komasinski asked Scamman whether he had the votes on the board; Scamman said he did, and he later orally accepted the proposal.

The terms of this settlement were that Morgan would be assigned to the next available principalship (presumably at the beginning of the 1982–83 school year), that he would retain his principal's salary until reappointed as a principal, that the school board would expunge from its files all references to the charge of discrimination, and that Morgan would not be penalized in the future because of his charge. The agreement was to be reduced to writing later. The meeting broke up, the end to the dispute apparently at hand. The defendants concede that Scamman made this agreement with Morgan.

But Scamman did not have the votes. The district court concluded: "Scamman canvassed some board members to determine what their opinions were on the proposed reinstatement of Mr. Morgan to the next available principal's position. The opinions which are documented in this record are all negative." Scamman did not speak with all of the members, but he spoke with enough to see that the deal would fail if put to a vote. The district court continued: "In an effort to avoid the negative effect of making a formal recommendation at a public meeting and having it defeated, Dr. Scamman decided not to make a formal recommendation at a public

meeting. Mr. Morgan was notified that the proposed settlement would not be implemented."

Morgan wants the board to implement the settlement. His argument has four steps: first, the existence of a settlement of a claim under Title VII is a question of federal law; second, federal law recognizes oral settlements; third, oral settlements are binding if approved by those with apparent authority; fourth, Scamman and the board's attorney had apparent authority to bind the board. Each link in this chain is troublesome.

Start with the proposition that the existence of a settlement is governed by federal law. We have held this at least three times. *Lyles v. Commercial Lovelace Motor Freight, Inc.*, 684 F.2d 501, 504 (7th Cir.1982); *Glass v. Rock Island Refining Corp.*, 788 F.2d 450, 454–55 (7th Cir.1986); *Taylor v. Gordon Flesch Co.*, 793 F.2d 858, 862 (7th Cir.1986). Each of these cases also holds that under federal law oral settlements of Title VII claims are enforceable. *Glass* and *Taylor* cite *Lyles*, and *Lyles*, which does not independently analyze the question, cites *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir.1981). See also *Eatmon v. Bristol Steel & Iron Works, Inc.*, 769 F.2d 1503 (11th Cir.1985) (following *Fulgence* ). The discussion in *Fulgence* reads:

> Since this case deals with the operation of a Congressional statutory scheme, the federal courts are competent to determine whether a settlement exists without resort to state law. Creation of a federal rule rather than absorption of a state rule is appropriate where, as here, the rights of the litigants and the operative legal policies derive from a federal source. No significant state interest would be served by absorbing state law as the rule of decision governing Title VII settlement agreements. On the other hand, Louisiana's requirement that settlement agreements be reduced to writing might hamper a significant federal interest, since Congress has mandated a policy of encouraging voluntary settle-

ment of Title VII claims. It bears noting, finally, that the Supreme Court has already established prerequisites to the validity of settlement agreements in Title VII suits. [They must be voluntary waivers.] We conclude that federal law determines the validity of oral settlement agreements in employment discrimination actions brought pursuant to Title VII.

662 F.2d at 1209, citations and footnote omitted. Morgan wants us to extend federal law to questions of authority to make the settlement agreement. Whether to do this depends in part on the strength of the principle that federal law applies.

The Rules of Decision Act, 28 U.S.C. § 1652, states: "The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." This statute, which *Fulgence* does not cite, is not limited to diversity cases. See, e.g., *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), which applies state law to determine the effect of a settlement in an antitrust case. Another statute, 42 U.S.C. § 1988, applicable to civil rights cases, provides:

> The jurisdiction in [civil rights cases] shall be exercised and enforced in conformity, with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court ... is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause....

Section 1988 has been understood to mean that state law applies to procedural matters in civil rights cases, unless a statute supplies a federal rule of decision or the state rule is "inconsistent with the Constitution and laws of the United States". E.g., *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) (applying state statute of limitations in civil rights case); *Robertson v. Wegmann*, 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978) (applying state survivorship rules in civil rights case). The "unless" clause means that a state rule hostile to the federal interest will not apply, e.g., *Burnett v. Grattan*, 468 U.S. 42, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984). But the state rule must be systematically hostile before a federal court may create federal common law. The survivorship rule in *Robertson* allowed the defendant to escape liability, but the Court nonetheless held that the state law applies because over the run of cases the state rule would not dramatically reduce the incentive to comply with the federal substantive rule.

The hostile or inadequate state rule is not the only one that prompts the creation of federal common law. The Supreme Court has applied nonstatutory federal law to disputes involving the United States as a party, disputes the Court thought should be governed by a rule applicable throughout the nation. E.g., *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973). It has declined to adopt federal common law for private disputes, however, even disputes that potentially affect federal interests, such as the regulation of air traffic, unless some other federal statute looks to the creation of a federal rule. Compare *Miree v. DeKalb County*, 433 U.S. 25, 28–33, 97 S.Ct. 2490, 2493–96, 53 L.Ed.2d 557 (1977) (no federal rule concerning accidents growing out of interstate aviation), with *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (federal rules apply to labor disputes under 29 U.S.C. § 185).

■ Questions concerning the appropriate scope of federal common law have produced a debate that does credit to the slogan "let a hundred flowers bloom and a hundred schools of thought contend". E.g., John Hart Ely, *The Irrepressible Myth of* Erie, 87 Harv.L.Rev. 693 (1974); Martha A. Field, *Sources of Law: The Scope of Federal Common Law*, 99 Harv. L.Rev. 882 (1986); Henry J. Friendly, *In Praise of* Erie—*And of the New Federal Common Law*, 39 N.Y.U.L.Rev. 383 (1964), reprinted in *Benchmarks* 155 (1967); Henry Hart, *The Relations Between State and Federal Common Law*, 54 Colum.L.Rev. 489 (1954); Thomas W. Merrill, *The Common Law Powers of the Federal Courts*, 52 U.Chi.L.Rev. 1 (1985); Paul J. Mishkin, *The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision*, 105 U.Pa.L.Rev. 797 (1957); Peter Westen & Jeffrey Lehman, *Is There Life for* Erie *After the Death of Diversity?*, 78 Mich.L. Rev. 311 (1980). None of these hundred voices disagrees with the principle of *Miree* that when the federal government is not a party to the litigation, neutral state rules that do not undermine federal interests should be applied unless some statute (or the Constitution) authorizes the federal court to create a rule of federal law. No statute authorizes courts generally to create federal procedural rules for the implementation of civil rights laws; § 1988 cuts the other way.

The Fifth Circuit pointed out in *Fulgence* that Congress wanted to encourage settlements under Title VII, but it is far from clear that enforcing oral settlement agreements entered into without actual authority will "encourage settlement." Perhaps it will just encourage people to be wary, to agree to nothing until the terms are down on paper and the agents have received explicit clearance for their bargain. The principle of contract law that requires important and lasting pacts to be written and signed, before they become enforceable, did not arise out of hostility to voluntary agreements. It arose to *facilitate* contracting by making it easier to see just

what has been agreed on. It is easy to dispute about the nature and meaning of oral exchanges; it is easy, too, for a party to claim that the other agreed to something he did not; the Statute of Frauds makes contracts more certain and their enforcement more expeditious, to the benefit rather than the detriment of contracting parties in general. See *Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280 (7th Cir.1986).

It is ironic that most of the cases that apply federal law to declare oral settlements effective do so to the detriment of plaintiffs under Title VII. *Fulgence, Lyles, Glass*, and *Taylor* all go for the defendants; each case declines to allow the plaintiff to back out of an oral settlement that no longer seemed as attractive as it once had. But whether the proposed rule of federal law cuts for or against plaintiffs as a group is not dispositive. The Court emphasized in *Robertson* that federal law should be created under § 1988 only if the state rule is systematically hostile to plaintiffs seeking to vindicate federal rights. "A state statute cannot be considered 'inconsistent' with federal law merely because the statute causes the plaintiff to lose the litigation. If the success of the § 1983 action were the only benchmark, there would be no reason at all to look to state law, for the appropriate rule then would always be the one favoring the plaintiff, and its source would be essentially irrelevant. But § 1988 quite clearly instructs us to refer to state statutes; it does not say that state law is to be accepted or rejected based solely on which side is advantaged thereby." 436 U.S. at 593, 98 S.Ct. at 1996.

We therefore have our doubts about the authority for and scope of any general rule that federal law governs all aspects of the settlements in Title VII litigation. The law of this circuit has been in some tension on this score. For example, two cases hold that the interpretation of a settlement agreement in Title VII litigation is a question of state law. *Air Line Stewards Ass'n v. Trans World Airlines, Inc.*, 713 F.2d 319, 321 (7th Cir.1983); *Air Line Stewards Ass'n v. American Airlines,*

*Inc.*, 763 F.2d 875, 877 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). Neither case cited *Lyles* or *Fulgence,* or suggested why the existence of a settlement depends on federal law yet its meaning depends on state law. There may be a reason; *Gully v. First National Bank,* 299 U.S. 109, 117–18, 57 S.Ct. 96, 99–100, 81 L.Ed. 70 (1937), observes that state law often determines the meaning of instruments that come about through federal law, when there is no continuing federal interest in their interpretation. But the reasoning of *Fulgence* might suggest a federal interest in interpretation as well as formation. As another example, *McCall-Bey v. Franzen,* 777 F.2d 1178, 1188 (7th Cir.1985), expresses "profound doubts" that a district court has the authority to enforce a settlement agreement unless there is an independent ground of jurisdiction such as diversity (or in this case pendent jurisdiction). The panel in *McCall-Bey* concluded that settlements ordinarily are contracts under state law and should be enforced in the way other contracts are enforced.

■ Nonetheless, it is possible to resolve this case without resolving these tensions. Even when federal common law applies to a case in which the United States is a party, a court ordinarily should adopt principles of state law as the rule of decision. *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728–29, 99 S.Ct. 1448, 1458–59, 59 L.Ed.2d 711 (1979); *Powers v. United States Postal Service,* 671 F.2d 1041, 1043–44 (7th Cir.1982). When it is not necessary to have a national rule, it is necessary not to have one. Lenders (as in *Kimbell*), landlords (as in *Powers*), and superintendents of schools (as here) learn the set of rules governing their conduct, and they are entitled to assume that the rules apply consistently. Scamman made agreements all the time. Some had to be reduced to writing; some needed the approval of the school board. The use of a federal rule for determining the consequences of Scamman's acts (and those of the board's lawyer) would bushwhack people who thought

they knew which acts were tentative and which were final. Rules should be as simple and predictable as possible; the "borrowing" of state law will achieve this.

True, we could not "borrow" state law concerning the need for a written agreement without overruling *Lyles, Glass,* and *Taylor.* But none of those cases considered whether state law concerning who has authority to settle a case should be borrowed. There are compelling reasons for borrowing state law on this score and no reasons to create a distinctive federal law.

Morgan wants nothing less than a rule of federal law reallocating a government's authority to make decisions—from the school board to its superintendent and lawyer. Congress has some latitude to affect the internal operations of states. See *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). The rationale of *Garcia* is that states have political remedies against depredations by Congress. States have no similar protection against the creation of federal common law by courts (although they may persuade Congress to undo what the courts have done). And there are limits on the power of the national government as a whole. Although Congress may require states to implement federal rules, see *FERC v. Mississippi,* 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982), the Court has not held that Congress may decide who within a state's government has the authority to act on behalf of that government. See *Coyle v. Oklahoma,* 221 U.S. 559, 565, 31 S.Ct. 688, 689, 55 L.Ed. 853 (1911) (Congress could not dictate a state's seat of government) (dictum); *United Beverage Co. v. Indiana Alcoholic Beverage Commission,* 760 F.2d 155 (7th Cir.1985) (states may apportion internal powers according to their own lights). Statutes occasionally couple designations of internal methods with the promise of new funding, but states retain the power to turn down the money and its strings. The application of Title VII to the states is based on Congress' power under § 5 of the fourteenth amendment, *Fitz-* *patrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), and § 5 allows Congress sweeping authority over the operation of state governments. When Congress exercises this power of implementation, however, it has authority that judges do not possess on their own. *Katzenbach v. Morgan,* 384 U.S. 641, 648–49, 86 S.Ct. 1717, 1722–23, 16 L.Ed.2d 828 (1966). So if the national government possesses the authority to decide who shall speak for the state or a political subdivision, that power must be exercised by Congress, at least to the extent of authorizing the creation of a new branch of the common law.

There is one potentially contrary decision. *Delaware Valley Citizens' Council v. Pennsylvania,* 755 F.2d 38 (3d Cir.), cert. denied, —— U.S. ——, 106 S.Ct. 67, 88 L.Ed.2d 54 (1985), concludes that as a matter of federal law a state is bound by a consent decree even though, a state court had held, the "consent" had been given by a person without authority to speak for the state. See also *Mid-South Towing Co. v. Har-Win, Inc.,* 733 F.2d 386, 390–91 (5th Cir.1984), an admiralty case against a private party, but significant nonetheless because the court concluded that a settlement would be enforced if approved by an attorney with apparent authority to do so. *Delaware Valley* held that the entry of the consent decree was conclusive on the question of authority. We doubt that the Third Circuit meant to allow any employee of a state to bind the entire state just by signing his name to a consent decree, though this would be the logical consequence of the decision. *Mid-South* did not rely on res judicata but announced a principle that attorneys are entitled to bind their clients by settling, in the absence of strong proof of absence of authority.

■ Neither of these cases discussed *United States v. Beebe,* 180 U.S. 343, 351–55, 21 S.Ct. 371, 374–76, 45 L.Ed. 563 (1901), which interprets federal common law to make the effectiveness of a consent judgment depend on actual authority. An attorney for the United States settled a

case, a consent judgment was entered, and the United States accepted money in fulfilment of the settlement. Later the United States moved to set aside the settlement and reinstate the suit on the ground that the government's attorney lacked actual authority to compromise the suit. The Court stated (*id.* at 352, 21 S.Ct. at 374): "Indeed, the utter want of power of an attorney, by virtue of his general retainer only, to compromise his client's claim, cannot, we think, be successfully disputed. A judgment entered upon such a compromise is subject to be set aside on the ground of lack of authority in the attorney to make the compromise on which the judgment rests." See also *Stone v. Bank of Commerce,* 174 U.S. 412, 19 S.Ct. 747, 43 L.Ed. 1028 (1899). Neither *Beebe* nor *Stone* has ever been questioned by the Court. As a result, even under principles of federal common law compromise judgments depend on the actual authority of the person purporting to compromise the claim. Whether Scamman and the board's attorney had actual authority then is a question of Indiana law.

There is, moreover, a substantial difference between this case and *Delaware Valley* and *Mid-South,* a difference that might lead even the Third and Fifth Circuits to look to Scamman's actual authority. Each of those cases involved a *judgment,* and the court was most reluctant to upset the judgment after it had been entered. Doctrines of finality are designed to preserve judgments. Morgan and Scamman may have compromised Morgan's claim, but this compromise did not end in a judgment. Morgan had not yet filed his suit. When the school board refused to implement the settlement, Morgan still had time to file this suit, and he cannot show detrimental reliance. Morgan's claim that Scamman struck an agreement that bound the board is therefore an argument of estoppel.

Under federal law the government usually cannot be estopped by the unauthorized acts of its agents. *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *Federal Crop Insurance Corp. v.*

*Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Phelps v. Federal Emergency Management Agency,* 785 F.2d 13 (1st Cir. 1986); *United States v. Medico Industries, Inc.,* 784 F.2d 840, 845–46 (7th Cir.1986). The question is: Who is in charge, the principal or the agent? Estoppel transfers authority from the principal to the agent. The "interest of the citizenry as a whole in obedience to the rule of law is undermined." *Community Health,* 467 U.S. at 60, 104 S.Ct. 2224 (footnote omitted). If estoppel is ever appropriate—and the Supreme Court has yet to say that it ever is—the minimum requirements include detrimental reliance by the private actor. Morgan did not rely to his detriment on the settlement. Doubtless he was disappointed, but he lost nothing; he was able to file the same timely lawsuit he would have filed had there never been a settlement. Morgan does not suggest that Indiana's law of estoppel of the government is any different, and at least two cases, *Middleton Motors, Inc. v. Indiana Department of State Revenue,* 269 Ind. 282, 380 N.E.2d 79 (1978), and *Board of School Commissioners v. State ex rel. Wolfolk,* 209 Ind. 498, 504–05, 199 N.E. 569, 572 (1936), say that state law of estoppel is the same as federal. The remaining question, then, concerns actual authority under state law.

■ The district court concluded that under the law of Indiana, only the school board may consent to a settlement that includes the reinstatement of an employee. Two statutes bear on the question. 4 Ind. Code § 20–5–3–8 states:

> ... [T]he president and secretary of the governing body of any school corporation are entitled, on behalf of the school corporation, to sign any contract. These contracts may include ... employment contracts and contracts for goods and services; however, each contract must be approved by a majority of the governing body.

Another provision, 4 Ind.Code § 20–6.1–4–17.1, establishes:

A contract of employment shall be entered into between the governing body of the school corporation and a principal or assistant principal subject to the following conditions: ... (3) Such contract may be altered or modified or rescinded in favor of a new contract at any time by mutual consent of the governing body of the school corporation and the principal or assistant principal, provided such contract when reduced to writing is not inconsistent with the provisions of this chapter.

The authority to make and modify contracts of employment is confided in the board, not in the superintendent of schools or the board's lawyer. So, for example, when a teacher who had worked six years thought she had acquired tenure, she found to her sorrow that she had not, because her first year's contract "did not comply with the terms of the statute." See *Wolfolk*, 199 N.E.2d at 572: A decision "can be binding only on the school officers to do what the statute authorizes, in the manner prescribed, and all who deal with such school officers do so at their peril and take notice of the extent of their authority.... Persons contracting with school trustees are bound to take notice that their powers are limited by law." Even after the teacher had worked for the full first year, the court held that her employment had not been valid. See also *McCrary Engineering Corp. v. Town of Upland*, 472 N.E.2d 1305, 1308 (Ind.App.1985). So much for the claim that a wholly executory agreement between a would-be principal and the superintendent of schools is binding in the absence of approval of the school board.

Morgan observes that the statute at issue in *Wolfolk* was not the same as the one in force today and that the school board regularly contracts without voting. It buys floor polish for the janitors under a general authorization to a purchasing agent; more to the point, Scamman has settled other complaints of discrimination without presenting the settlements to the board for approval. The defendants do not dispute this; they say only that these settlements neither enlarge Scamman's authority nor demonstrate the board's policy, because none of the other settlements involved reemployment, a subject that is of special concern to the board. The statutes speak of employment and contracts to purchase goods; the other settlements involved payments of money. This is not a completely satisfactory reply; surely the board would want to be involved in a settlement for, say, $500,000 in "front pay" in lieu of reinstatement. Nonetheless, it is sufficient for current purposes.

■ The two state statutes in question do not expressly state that no contract of employment is effective unless it has been approved by a majority of the school board. Thus the statutes may be described as ambiguous concerning the authority of the superintendent of schools to promise to appoint someone as a principal of a school. But it is not unreasonable for the school board to interpret these laws as giving it power to veto the superintendent's offer to employ (or reemploy) someone as the principal of a school. See *Young v. Community Nutrition Institute*, — U.S. —, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *Watkins v. Blinzinger*, 789 F.2d 474, 478 (7th Cir.1986). The decision who shall be the principal is important in any school, and the statutes grant the school board authority to make important decisions. We need not limn the scope of the board's right to approve the superintendent's decisions to conclude that the board's reading is a permissible one. The district court therefore properly concluded that under the law of Indiana the settlement between Morgan and Scamman was to take effect only on the approval of the board, an approval that was not forthcoming.

## II

All of this work has simply cleared the way to reach the question whether Morgan was a victim of racial discrimination. The district court found that he was not. The

finding must stand unless clearly erroneous. *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).

■ The court found that Morgan was induced to return to the classroom because the school officials had sincere doubts about Morgan's judgment. A principal must be discreet (and playing tapes of conversations loudly is not discreet); he must be diligent (and doing nothing about stolen athletic equipment is not diligent); he must follow administrative rules (and failing to report sexual misconduct does not follow the rules); he must protect the privacy of the students (and requiring a student to submit to an interview by an outsider neither follows the rules nor protects the student's privacy). This was enough to persuade the board that Morgan did not belong in the principal's office. The district court observed that the other demoted principals were white, and that Dale Fozo, a white principal whose misjudgment about the need to report sexual misconduct was a cause of concern, also landed back in the classroom. Morgan emphasizes that Fozo was not suspended; only Morgan was. But this may have had something to do with the fact that Morgan made the same mistake twice, and at all events the suspension is not a cause of any of Morgan's injury. The district court found that no white principal had made misjudgments as serious as Morgan's. This finding, like the finding that Morgan's conduct rather than his race led to his downfall, is supported by the record. Although the district court also found that Morgan had failed to establish a prima facie case of discrimination, a finding Morgan says is erroneous, this is no longer important. Once the trial is over, disputes about the prima facie case fall away. *United States Postal Service v. Aikens,* 460 U.S. 711, 715–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983). The only question is whether Morgan's race was the cause of his demotion; the finding that it was not is not clearly erroneous.

Morgan also maintains that the school corporation violated 42 U.S.C. § 1981 by breaking the contract of settlement. The district court's finding that the school district was dissatisfied with Morgan's performance also supplies a sufficient race-neutral reason for refusing to give him the next available principal's position. The claim under 42 U.S.C. § 1983—which Morgan complains that the district judge did not address—fares no better than the counts alleging violations of Title VII and § 1981. The theories are fundamentally the same. The complaint also contained a claim under an Indiana statute and a contention that Morgan is a third party beneficiary of a consent decree in other litigation, but these arguments are mentioned only in passing. An unelaborated assertion that the district court erred does not require us to scour the record on our own. See *In re Bear,* 789 F.2d 577 (7th Cir.1986). Morgan has not properly presented these claims on appeal. There is, finally, a contention that the district court referred to a transcript of a tape recording, even though only the tape and not the transcript was admitted into evidence. The context makes it clear that the court referred to the transcript only to show that Scamman's story has been consistent through time. If this was error, it was harmless.

### III

■ One final word about the brief Morgan filed in this court. Although the rules limit briefs to 50 pages, this one had 54, numbered iii–vi and 1–50. Morgan put such things as the questions presented and the statement of the case in pages iii–vi. The rules limit to 50 the number of pages allowed (unless the court grants a motion for more), which means *total* pages after the table of contents, not just pages with Arabic numerals. The page limit is designed as much for the benefit of the litigants as for the benefit of the court. If extra pages mean stronger argument, enforcement of the page limit protects those who obey the rules. But extra pages may not be stronger argument. A limitation induces the advocate to write tight prose, which helps his client's cause. We would

not have granted a motion for leave to file an oversized brief. See *United States v. Devine*, 768 F.2d 210 (7th Cir.1985) (en banc).

AFFIRMED.