19 F.3d 21
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Theodore E. ARTIS, Plaintiff-Appellant,
v.
STATE of Indiana, Defendant-Appellee.
 No. 92-3219.
 United States Court of Appeals, Seventh Circuit.
 Submitted Feb. 22, 1994.*
Decided Feb. 28, 1994.
 
 Before CUMMINGS, KANNE and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Theodore Artis filed suit against the state of Indiana, claiming that his employer, the Indiana Department of Highways (IDOH) (now Indiana Department of Transportation), failed to award him a merit pay increase for racially discriminatory reasons and harassed and terminated him in retaliation for filing a charge with the Equal Employment Opportunity Commission (EEOC). After a bench trial, the district court ruled in favor of the IDOH. Artis appeals. Finding no clear error in the district court's findings of fact, Fed.R.Civ.P. 52(a); Rodgers v. Western-Southern Life Insurance Co., 12 F.3d 668, ---- (7th Cir.1993), and deferring to its credibility determinations, id. at ----, we agree that Artis failed to meet the ultimate burden of showing that he was the victim of intentional discrimination. St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742, 2747 (1993); Texas Dep't of Community Affairs v. Burdine, 450 US. 248, 253 (1981). Accordingly, we affirm for the reasons stated in the attached opinion.[1]
 
 
 2
 We briefly address Artis's other contentions raised on appeal. We conclude that the district court properly limited the scope of Artis's complaint to the issues that were "reasonably related" to the charges he filed with the EEOC. Rush v. McDonald's Corp., 966 F.2d 1104, 1110 (7th Cir.1992). In addition, without a showing of bad faith on the part of the IDOH, the district court was not required to draw negative inferences from the IDOH's failure to produce requested documents. Brown & Williamson Tobacco Corp. v. Jacobson, 827 F.2d 1119, 1134 (7th Cir.1987), cert. denied, 485 U.S. 993 (1988). We also hold that Artis has failed to support, with sufficient facts, his claim that Judge Tinder was biased because he investigated the IDOH for discrimination in awarding contracts as a U.S. Attorney. Thus, the issue is waived. Fed.R.App.P. 28(a)(5); John v. Barron, 897 F.2d 1387, 1393 (7th Cir.1990), cert. denied, 498 U.S. 821 (1990). Even after reviewing Artis's motion to disqualify Judge Tinder, we conclude that it was properly denied because the alleged conflict does not arise out of the "particular case in controversy" at issue here. 28 U.S.C. 455(b)(3). Finally, Artis's claims concerning the denial of unemployment benefits by the Indiana Employment Security Division, the inadequacy of the EEOC investigation, alleged conflicts of interest of EEOC representatives, the EEOC's improper assertion of the deliberative process privilege prior to the commencement of this suit and its inability to produce documents, are not germane to the employment discrimination claim against the IDOH at issue in this case.
 
 
 3
 AFFIRMED.
 
 ATTACHMENT
 UNITED STATES DISTRICT COURT
 SOUTHERN DISTRICT OF INDIANA
 INDIANAPOLIS DIVISION
 
 4
 Theodore E. Artis, Plaintiff,
 
 
 5
 vs.
 
 
 6
 State of Indiana, Defendant.
 
 
 7
 Cause No. IP 87-817-C.
 
 
 8
 ENTRY OF FINDINGS OF FACT AND CONCLUSIONS OF LAW
 
 
 9
 This cause came before the Court for trial on October 10, 11, 14 and 15, 1991 on the amended complaint of Theodore Artis and on the defendant's answer. The plaintiff was present in person and the defendant was present by counsel. The cause was submitted and the evidence heard.
 
 
 10
 Whereupon the Court, having considered such pleadings and the evidence adduced thereon, and having further considered the arguments of the parties with respect to this action, and being duly advised, now makes the following findings of fact and conclusions of law.
 
 FINDINGS OF FACT
 
 11
 1. Plaintiff Theodore Artis ("Artis") is Black. He was formerly employed by the Indiana Department of Highways, now known as the Indiana Department of Transportation. The employing agency shall hereafter be referred to as the IDOH.
 
 
 12
 2. Artis was hired by the IDOH as a Draftsman III on July 31, 1978. He was assigned to and remained in the Bridge Steel Group of the Bridge Design Division of the IDOH. He worked in a squad of five to ten employees on various project. The squad was directed on a daily basis by a supervisor, which in Artis' case at the times relevant to this action was Mr. Meng.
 
 
 13
 3. IDOH employees were subject to an annual performance appraisal. Employees were rated in the following areas: job knowledge and expertise, communication functions, work coordination, dependability, problem-solving, financial planning, supervisory functions, interpersonal relations and attendance/punctuality. The mechanism for these appraisals was for the employee's immediate supervisor to rate the employee, pass the appraisal document on to higher level supervisors for review, possible "suggested" revisions and to be initialed, and then to the Director of the Personnel Division, who either personally or through delegated authority examined the appraisal for completeness and then signed it. At this point it became the official employee performance appraisal of the IDOH. The performance appraisal itself consisted in part of two classes of performance--major and minor, which identified the above categories of employee performance which IDOH policy assigned to one of these groups.
 
 
 14
 4. In July 1983 Artis' employee performance appraisal was conducted and he received a "satisfactory" or better evaluation in each of the major categories of performance. Accordingly, he was eligible to receive and did receive a merit pay raise. However, it should be noted that Artis' principal evaluation was performed by his immediate supervisor, Mr. Meng. Meng was known to be overly lenient toward his employees in general and specifically with regard to their evaluations. All of the credible evidence at trial indicated that Artis was a very difficult person to work with or around. For example, he refused to speak with any of his co-employees, except for his immediate supervisors. He would take no direction or suggestions from co-employees, unless they were charged with supervising him, and he would not discuss his work with anyone other than his immediate supervisors. If he was to be given a work assignment, Mr. Meng would have to give it to him directly, and he would report back to Mr. Meng, only, about the progress of the project. When in meetings with his supervisors, Artis would often turn his back on his supervisors and hum or sing aloud during the meetings. At other times, he would walk out during the middle of meetings without an excuse or permission. Occasionally he would stand during the meetings and stare at the ceiling. Further, while working at his desk, Artis would continually play a radio or tape player in a manner that was audible to those around him. Finally, for a long period of time, Artis had a time and attendance problem. He would use all of his earned leave time as soon as he was eligible for it so that when the need to take emergency or sick leave arose, he would have to go into a deficit status on his leave authorization. He had received "unsatisfactory" ratings regarding time and attendance, but, surprisingly[1], until 1984, that category was considered by IDOH to be a "minor" aspect of an employee's performance. However, despite these problems, Meng's evaluations of Artis allowed him to receive merit increases on a regular basis until 1985.
 
 
 15
 5. Until 1984 IDOH employee performance appraisals were conducted on or near the anniversary of the employee's hiring. Starting in that year, however, the IDOH was compelled by the Personnel Division of the State of Indiana to restructure the timing of the employee performance appraisals to be conducted in either February, May, August or November. Artis annual review was conducted in May.
 
 
 16
 6. Artis' next annual employee evaluation was conducted in May 1984. At that time Artis again received a "satisfactory" or better evaluation in each of the major categories of performance. Accordingly, he was eligible to receive and did receive a merit pay raise on the anniversary date of his employment.
 
 
 17
 7. Artis' evaluation for the period from May 1984 to May 1985 was conducted in June 1985. On this occasion he received an "unsatisfactory" performance rating in attendance and punctuality, which had become a "major" aspect of employee performance (rather than minor) at the request of Stan Yoder, the Chief of the Division of Design prior to August 1985. This new treatment of time and attendance was enforced through the new Division Chief, Mr. Woods. This rating in the area of attendance and punctuality was similar to ratings he had received in the past, but its significance was now increased.
 
 
 18
 8. Because of this rating Artis did not receive a merit pay raise in May 1985. Instead, relations with his superiors and, arguably, his fellow employees on the "squad" level deteriorated. A 3-month follow-up evaluation was performed in August 1985.
 
 
 19
 9. Dissatisfied with his performance evaluation, Artis filed a complaint with the IDOH equal employment opportunity office on May 9, 1985. This complaint is referred to herein as the internal EEO complaint.
 
 
 20
 10. Steve Hull, the Bridge Services Engineer from 1982 through 1985, was asked to research the internal EEO complaint with respect to the attendance and performance appraisal records of Artis and other employees of the Bridge Section. This was within the scope of his duties as the person who provided office support and administration to the Bridge Division of the IDOH.
 
 
 21
 11. A IDOH EEO fact-finding conference was conducted on July 12, 1985. This conference was attended by (1) Artis; (2) William Abbott, Engineer of Bridge Design; (3) Steve Hull; (4) Robert Woods; (5) Robert Schickel; (6) Glen Greenlee; (7) Julie Robert; and (8) Cassandra Strait. Artis' complaint was not resolved through the fact-finding conference.
 
 
 22
 12. Artis was disciplined in his employment with the IDOH on the following occasions:
 
 
 23
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 24
 13. Artis' first complaint to an agency outside the IDOH regarding his employment problems was made on July 31, 1985, when he filed a charge of racial discrimination with the Indiana Civil Rights Commission (the ICRC). This complaint was assigned number EMRA 85080688 and after dual filing with the EEOC was assigned No. jek-ck-qnkkwith that Agency. Notice of this complaint was sent to the Chief of the Division of Personnel of the IDOH on August 15, 1985.
 
 
 25
 14. On August 16, 1985 the IDOH chief legal counsel, Gerry Burton, went to Artis' desk and discussed his employment situation. Burton and Artis had previously had only casual contact with each other, consisting of acknowledging each other when passing in the hallways. Burton and Artis specifically discussed Artis' complaint and concerns of civil rights violations, Burton assured Artis of his (Burton's) complete support in any legitimate discrimination matter, Artis refused to agree to meet with upper management of the IDOH to discuss his situation, Artis informed Burton of the ICRC discrimination complaint and, finally, Burton informed Artis that continued violation of IDOH rules would lead to insubordination charges and, potentially, to termination of his employment.
 
 
 26
 15. Burton's action in discussing with Artis his employment situation was within the scope of his duties as legal officer for the IDOH. Although this meeting occurred in the open area at Artis' desk, no other IDOH employee was within hearing distance. The meeting lasted only 15 minutes, from 12:40 to 12:55 p.m. During the course of the meeting, the two specifically discussed Artis' reasons for not attending a meeting with Mr. Woods that morning. These were that Artis was "representing himself" and that he was in fear of reprisals from supervisors within the Bridge Division.
 
 
 27
 16. Burton and Artis had different views of the meeting: Burton thought Artis' concerns were a pretext for further insubordination, while Artis thought Burton's visit was intimidation (by warning him of the consequences of missing meetings he had been ordered and expected to attend). However, prior to that meeting Burton had no knowledge of the ICRC discrimination complaint.
 
 
 28
 17. It should be noted that overall, Mr. Artis has a peculiar view of the things that go on around him. As was evident from his testimony and the evidence in the trial, he viewed virtually everything that occurred in the workplace as being focused or directed personally at him. (This view has persisted throughout this litigation, as well, as evidenced by the tone of many of the intricate hand-printed pleadings filed by the plaintiff throughout the years of this litigation.) Mr. Artis has a very selective memory, with excellent recall of events that appear to be favorable to him and virtually no recollection of well documented facts which he does not perceive to be favorable to him. The court does not intend to portray Mr. Artis as a person who testified in an intentionally false manner; however, it did appear that his high motivation to prevail in the suit and his animosity toward some of his co-workers and supervisors adversely affected his credibility. In short, his version of the critical events was not plausible. The Court further finds that the spectre of the mishandling or manipulation of records or other information raised by Mr. Artis is a creation solely of his own mind, unsubstantiated by the record or the facts. His view that his supervisors and the investigating agencies, including those entirely independent of the IDOH, have combined to depict him in an unfavorable light or to wrongfully deprive him of benefits or rights to which he is entitled, is similarly without basis.
 
 
 29
 18. On August 14, 1985 Artis wrote a letter to the Director of the ICRC complaining of having been retaliated against on August 5, 1985 by Mr. Woods and Mr. Schickel because of asserted abuse of excused absence rules, improper use of time and unauthorized leave. The details of this discipline are supplied in the document identified as Exhibit B to Plaintiff's Exhibit 2, as well as being part of Artis' personnel file. This was followed with a letter dated August 19, 1985 complaining of Mr. Burton's meeting with him and characterizing that meeting as further retaliation. These letters, together, were treated by the ICRC as a new charge of retaliation. This new charge was assigned number EMRT 85100992.
 
 
 30
 19. October 1985 was the watershed of the plaintiff's employment with the IDOH. This was first because of the discipline incidents already identified and because on October 15, 1985 Hull attempted to have a second meeting with Artis. Hull had brought a tape recorder to this meeting since Artis had recorded an earlier meeting. Artis, however, would not respond verbally when Hull asked him repeatedly whether he was ready to begin. Instead, he gave an ambiguous shrug and raised his arms from his side, palms uplifted. Artis confirmed this conduct during his testimony, and the court even heard a tape recording of a particular disciplinary conference which included the distracting humming or singing of Mr. Artis during the attempted presentation by his supervisors. The court also heard the recording of Artis interrupting his supervisor in a very aggressive and hostile manner during a disciplinary conference.
 
 
 31
 20. Hull left to get his superior, Mr. Woods, who returned with Hull and thereafter the meeting was conducted. Nonetheless, it was not uncommon when interacting with his supervisors for Artis to look around, hum or sing and not respond to questions.
 
 
 32
 21. Woods played the most active role of any of Artis' superiors in relation to Artis' employment. In fact, during his first day on the job as Division Chief, Woods issued a verbal reprimand to Artis for the unauthorized use of two leave days. Artis assumed from that point forward that Woods was biased against him, and often responded to Woods' efforts to supervise him in the bizarre and insubordinate manner described above.
 
 
 33
 22. A third complaint was filed with the ICRC on October 29, 1985. It related to the 3-month follow-up evaluation which Artis received on August 23, 1985. It was docketed within the ICRC as No. EMRT 85101117 and with the EEOC as No. bwx-gt-qmrh
 
 
 34
 23. The discrimination and retaliation complaints on file with the ICRC and the EEOC in 1985 were ultimately assigned to an investigator, Lea Ashley. Ms. Ashley conferred with Artis in early October 1986 and thereafter followed EEOC policy by refusing to disclose to Artis the IDOH's response to the complaints while the case was pending.
 
 
 35
 24. The EEOC concluded its investigation in April 1987 after Artis informed it that he had no additional information to provide. Right-to-sue letters were issued on April 23 and 27, 1987 and this action was then filed on July 31, 1987. Mr. Artis has proceeded pro se throughout the case, demonstrating diligence and tenacity in pressing his claims.
 
 
 36
 25. In his amended complaint Artis alleges that the IDOH discriminated against him on the basis of his race in the following respects:
 
 
 37
 i) his supervisors manipulated his records to give the appearance that he had poor attendance;
 
 
 38
 ii) he was assigned menial duties and was the target of unfairly adverse recommendations and comments, creating a hostile environment;
 
 
 39
 iii) after a charge of discrimination was filed with the EEOC the defendant "began continuous harassment and retaliatory measures" against him;
 
 
 40
 iv) there was further retaliation against him, including the termination of his employment, on March 6, 1987, because of his request to use the restroom during a meeting; and
 
 
 41
 v) the IDOH reported false information to the Indiana Employment Security Division, resulting in the denial of unemployment benefits to him.
 
 
 42
 These were the issues identified in the Entry Reviewing Issues for Trial which the Court issued on October 8, 1991.
 
 
 43
 26. Any conclusion of law stated below, to the extent that it constitutes a finding of fact, is herein incorporated by reference as an additional finding of fact by the court.
 
 Conclusions of Law
 
 44
 1. 42 U.S.C. Sec. 2000e-2 (1988) makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." Additionally, a companion section makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" in connection with an unlawful employment practice. 42 U.S.C. Sec. 2000e-3(a).
 
 
 45
 2. Jurisdiction over these claims is vested in the District Court, but only to the extent that Artis has fairly presented his claims to the EEOC. The scope of subsequent judicial proceedings is limited by the nature of the charges filed with the EEOC. Rush v. McDonald's Corporation, No. 91-2151 (7th Cir. June 29, 1992), slip op. at 9. The rule is this: "all claims of discrimination are cognizable that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.' " Babrocky v. Jewel Food Co., 773 F.2d 857, 864 (7th Cir.1985), quoting Jenkins v. Blue Cross Mut. Hosp. Ins., Inc., 538 F.2d 164, 167 (7th Cir.) (en banc), cert. denied, 429 U.S. 986 (1976). The corollary to this rule, of course, is that the filing of only general charges with the EEOC--or of no charges at all--will not preserve a later claim in court. Rush, slip op. at 10-13. The rationale for this rule is simply that, without notice of some specifics of the claim, the EEOC cannot fulfill its statutory function and a contrary rule would frustrate the effectiveness of prior resort to administrative relief which is required by statute.
 
 
 46
 3. Artis filed three (3) complaints with the EEOC (or its state-agency counterpart, the ICRC). These complaints and certain details associated with them are depicted as follows:
 
 
 47
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 48
 4. After consideration of the content of the charges filed in each of the above matters it must be concluded that Artis' charges in his amended complaint of (1) assignment of menial duties, adverse comments, etc., (2) termination of his employment and (3) the reporting of false information to the Indiana Employment Security Division are outside the scope of what can be considered here, i.e., these allegations are not "like or reasonably related to the allegations of the [other] charge[s] and growing out of such allegations." Thus, although identified as "issues for trial" in the Entry of October 8, 1991, they cannot be adjudicated, nor need they be mentioned further.
 
 
 49
 5. Throughout the trial the plaintiff retains the ultimate burden of proving by a preponderance of the evidence the existence of purposeful discrimination. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482 (1983). See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1184 (11th Cir.1984) ("The 'ultimate question' in a disparate treatment case is not whether the plaintiff established a prima facie case or demonstrated pretext, but 'whether the defendant intentionally discriminated against the plaintiff' "), quoting Aikens, 460 U.S. at 714-15, 103 S.Ct. at 1481-82.
 
 
 50
 6. In cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct. Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir.1989).
 
 
 51
 7. In a Title VII disparate treatment case, "the allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." Id. at 253 n. 8, 101 S.Ct. at 1094 n. 8. The Supreme Court has said, however, that "where the defendant has done everything that would be required of him if the plaintiff made out a prima facie case, whether plaintiff really did so is no longer relevant." U.S. Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482 (1983); see also Kier v. Commercial Union Ins. Cos., 808 F.2d 1254, 1257 (7th Cir.1987) ("After a trial on the merits, 'disputes about the underlying prima facie case fall away.' ") (quoting Morgan v. South Bend Community School Corp., 797 F.2d 471, 480 (7th Cir.1986)).
 
 
 52
 8. At trial, the Court took under advisement the defendant's motion for involuntary dismissal at the close of the plaintiff's case. Accordingly, the IDOH presented the evidence it deemed necessary to rebut a prima facie inference of intentional discrimination. Thus, an explicit determination as to whether such an inference would be justified is unnecessary. See McCluney v. Jos. Schlitz Brewing Co., 728 F.2d 924 (7th Cir.1984) (court will not consider whether district court erred in determination of prima facie case where both sides offered evidence and district court had enough evidence to decide ultimate issue of intentional discrimination). This requires that the defendant's motion for involuntary dismissal at the close of the plaintiff's case be denied. Instead, it is proper to proceed directly to consideration of the IDOH's rebuttal and the ultimate question of intentional discrimination (as to those issues which are within the scope of the EEO charges).
 
 
 53
 9. To succeed on a claim of disparate treatment, the plaintiff must prove that the employer acted with a discriminatory intent or motive in administering its employment practices. Watson v. Ft. Worth Bank & Trust, 487 U.S. 977, 986 (1988). There was no direct evidence of discrimination in this case, i.e., there was no evidence that the IDOH acted in a purposeful manner toward Artis because of his race. Artis has, instead, trodden the path of indirect proof.
 
 
 54
 10. The change in the weight accorded various factors in employee performance was not applied exclusively to Artis, exclusively to Blacks or other minorities and was not caused by Artis' employment. The IDOH, moreover, is entitled to establish--and adjust--the performance standards for evaluation of its employees. Palucki v. Sears, Roebuck & Co., 879 F.2d 1568 (7th Cir.1989).
 
 
 55
 11. Further, the change in disciplinary measures taken with respect to Artis based on the change in his supervisors is not itself suspect because there is no requirement of consistency in such matters. Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir.1989).
 
 
 56
 12. Artis simply did not produce evidence that the IDOH considered the impermissible factor of race when it evaluated his performance or, later, in the progressive discipline which it imposed. Furthermore, given his inadequate performance in major areas of performance, his disobedience of orders from his superiors and his ardent penchant for obstinate behavior in relating to his superiors and co-workers, the IDOH had a valid, nondiscriminatory reason to discipline him. Those factors, standing alone, would have induced the IDOH to make the same decision.
 
 
 57
 13. He produced no evidence of dissimilar treatment of other employees, whether members of a protected class or not. The IDOH has exhaustively documented the basis for its evaluation of the plaintiff's work. The maintenance, completeness and authenticity of those documents as records of the plaintiff's employment, performance and problems have not been credibly challenged. That documentation supports its decision and does not suggest the consideration or even the hint of an improper consideration. Mr. Artis was a problem employee whose singular behavior in the workplace ultimately led to his termination. The fact that other employees, whether Black or not, were not similarly dealt with is testimony only to the fact that no others, so far as the evidence showed, engaged in the nature or magnitude of conduct as did Mr. Artis.
 
 
 58
 14. Title VII makes it unlawful for an employer to discharge or otherwise discriminate against an employee because that employee has "made a charge" under Title VII. 42 U.S.C. Sec. 2000e-3(a) (1988). In Collins v. Illinois, 830 F.2d 692 (7th Cir.1987), the Court set forth the elements of a prima facie case under this provision:
 
 
 59
 To establish a prima facie case of retaliation, the plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) that [sic] there is a causal link between the protected expression and the adverse action.
 
 
 60
 Id. at 702 (quoting Jennings v. Tinley Park Community Consolidated District No. 146, 796 F.2d 962, 966-67 (7th Cir.1986)).
 
 
 61
 15. There was no "causal link" between Artis' filing of one or more charges with the EEOC and any of the action taken by the IDOH with respect to his employment. His supervisors' disapproval of his use of his working day or State copy machines to pursue the initial discrimination claim was neither unreasonable nor unlawful. Garret v. Mobile Oil Corp., 531 F.2d 892 (8th Cir.), cert. denied, 429 U.S. 848 (1976). See also Jackson v. Saint Joseph State Hosp., 840 F.2d 1387, 1391 (8th Cir.1988) ("Title VII protection from retaliation for filing a complaint does not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct in dealing with subordinates and with his peers"). Therefore, Artis cannot prevail in his claims of retaliation.
 
 
 62
 16. Artis has failed in his burden of proof with respect to the element of discrimination. He has likewise failed to overcome the IDOH's evidence that it acted in a measured, race-neutral manner in its evaluation of his work performance. He has thus failed to establish his entitlement to relief under Title VII and judgment should now be entered for the defendant and against the plaintiff, consistent with this Entry.
 
 
 63
 ALL OF WHICH IS ORDERED this 23rd day of July 1992.
 
 
 64
 /s/ John Daniel Tinder
 
 JOHN DANIEL TINDER, Judge
 United States District Court
 Copies to:
 
 65
 Theodore E. Artis, General Delivery, Indianapolis, Indiana 46206-9999
 
 
 66
 Theodore E. Artis, P.O. Box 394, Indianapolis, Indiana 46206-999
 
 
 67
 Sabra Weliever, Office of the Attorney General, 219 State House, Indianapolis, Indiana 46204
 
 
 
 *
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Circuit Rule 34(f). Artis has filed such a statement. After considering that statement, we deny the request for oral argument and decide the appeal on the brief and record
 
 
 [1]
 Paragraph 7 of the district court's findings requires one correction. The cite to "Id. at 253 n. 8, 101 S.Ct. at 1094 n. 8" should be replaced with " Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 253 n. 8, 101 S.Ct. 1089, 1094 n. 8 (1981)."
 
 
 [1]
 The court is surprised by this because it would expect that any public office (or private enterprise, for that matter) would consider time and attendance to be a major factor in appraising its employees