FRANCINE BERNSTEIN, Legal Guardian for Bradley Bernstein, Her Son, Plaintiff-Appellant, v. THE DEPARTMENT OF HUMAN SERVICES *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—07—3005

Opinion filed June 19, 2009.

Robert T. O'Donnell and David W. Seabright, both of Eiden & O'Donnell, Ltd., of Vernon Hills, for appellant.

Lisa Madigan, Attorney General, of Chicago (Paul Racette, Assistant Attorney General, of counsel), for appellee Department of Human Services.

Matthew R. Henderson and Timothy G. Shelton, both of Hinshaw & Culbertson, L.L.P., of Chicago, for appellee Trinity Services, Inc.

JUSTICE JOSEPH GORDON delivered the opinion of the court:
This matter arises from an order of the circuit court granting motions to dismiss the complaint of plaintiff, Francine Bernstein, filed by defendants, the Illinois Department of Health and Human Services (Department) and Trinity Services, Incorporated. For the reasons that follow, we affirm.

## I. BACKGROUND

On October 31, 2005, the plaintiff, Francine Bernstein, filed a complaint against the defendants seeking, in part, an injunction requiring defendant Trinity to use contingent electric shock therapy to treat her son, Bradley. In her complaint, plaintiff avers that her 48-year-old autistic and mentally retarded son lives in a group home in

Chicago, which is currently operated by Trinity Services, Incorporated (Trinity), and had been previously operated by Blare House, Incorporated (Blare House). She states that, as a consequence of her son's disabilities, her son engages in severe episodes of self-injurious behavior such as hitting his head or banging his head into hard surfaces—behavior which, in the past, has resulted in serious eye injuries that required hospitalization. Plaintiff alleges that the one therapy that has been successfully utilized to control this behavior is contingent electronic shock (CES), through the administration of electric shock to Bradley's body when he engages in self-injurious behavior in an effort to condition him to stop engaging in such behavior.

The controversy concerning the use of this treatment for plaintiff goes back to 1985. In that year, the Illinois Department of Health and Human Services objected to the use of such therapy and threatened to refuse funding to Bradley's residential service provider, Blare House. As a result of this threat, plaintiff filed a lawsuit against the Department alleging that CES was an appropriate and necessary form of treatment for Bradley and seeking to enjoin the Department from withholding funding from Blare House based on its use of CES to treat Bradley. The lawsuit resulted in a consent decree between the parties on March 10, 1987, a copy of which was attached to plaintiff's complaint. Under the terms of that agreement, the Department was barred from reducing funding to Blare House in retaliation for the facility's use of CES to treat Bradley. The consent decree also recites that the use of CES by Blare House was an adequate and effective treatment for Bradley and was "necessary to insure Bradley's right to adequate and humane care in the least restrictive environment" and that any care plan that did not include CES would "either fail to deter Bradley's self injurious behaviors or so severely restrict Bradley's activities so as to impair his communicative skills, learning abilities and interaction with his environment."

After this decree was entered, Bradley continued to reside at the residential facility operated by Blare House and continued to receive CES. In 2003, however, plaintiff alleges that another dispute arose between plaintiff and Blare House regarding the continued use of CES and plaintiff filed another lawsuit to ensure its continued use. On April 10, 2006, the plaintiff and Trinity, which had acquired Blare House, reached a settlement agreement which provided that Bradley would be treated consistently with the terms of a social transition plan drafted in March 2006 by a clinical psychologist. That plan, which was attached to the complaint, provided that Bradley could still be treated with CES, but that an attempt should be made to "wean Bradley off of" the treatment, based on the psychologist's conclusion

that CES did "not appear warranted given the current low intensity of self-abuse behavior." The agreement further stated that "in the event that this treatment plan and other reasonable alternative treatment options for mediating self-injurious behaviors are unsuccessful, the parties may propose or advocate a return to contingent electric shock to the extent permitted by law." The agreement also required Trinity to keep plaintiff "fully and completely apprised of all material developments" regarding Bradley's care. Although the settlement agreement is dated April 10, 2006, it was not executed by the parties until July 2006.

According to plaintiff's complaint, Trinity abruptly stopped using CES to treat Bradley on or about September 27, 2006, without any notice to plaintiff and in violation of the settlement agreement, which called for Trinity to "wean" him off the treatment. Plaintiff alleges that after the use of CES ceased, her son's behavior deteriorated rapidly and that he subsequently injured himself so badly that he required hospitalization. Plaintiff claims that this conduct by Trinity constituted a breach of the settlement agreement and prayed for an injunction compelling Trinity to resume the use of CES.

Trinity filed a motion to dismiss plaintiff's complaint pursuant to section 2—619 of the Code of Civil Procedure (735 ILCS 5/2—619 (West 2006)), arguing that the settlement agreement requiring the continued use of CES could not be enforced because a statutory proscription of the use of electric shock therapy, namely section 15f of the Mental Health and Developmental Disabilities Administrative Act (Act) (20 ILCS 1705/15f (West 2006) (stating that individual behavioral support plans for those with "behavioral challenges" may not include "electric shock")), had become effective six weeks prior to the date on which the settlement agreement was entered into by the parties. Trinity noted that although the parties reached the settlement agreement on April 10, 2006, the agreement was not executed until July of 2006, weeks after section 15f became effective. Trinity contends that because the performance of its duty to administer CES under the contract would be illegal, the agreement was unenforceable.

Plaintiff filed a response to the motion to dismiss arguing that section 15f's proscription on the use of electric shock therapy for those with behavioral challenges could not be applied retroactively to prevent the use of CES on Bradley because Bradley had a "vested right" to receive such therapy. Plaintiff argued that such a right was vested under both the settlement agreement entered between the parties in 2006 and a court order entered by the Honorable Stephen Yates in 1986 which decided the first lawsuit between the parties.

Plaintiff contends that in that first lawsuit, the court approved the use of CES, approved an individual services plan which set forth "specific procedures and protocols as to shockable behaviors, shock delivery, and staff training and reporting," and issued an injunction against the Department barring it from reducing its funding of Blare House because of the use of CES. Plaintiff further averred in her response that she provided status reports pursuant to the court's order on a biweekly basis until October 17, 1995, when Judge Yates reduced the reporting requirements from biweekly to quarterly. In that same order, plaintiff alleges, the court suspended the requirement for annual court review of CES and "found it was approved generally as long as it was deemed clinically appropriate as determined by the behavioral psychologist responsible for Bradley's individual services plan."

In support of this claim, plaintiff attached as exhibits copies of plaintiff's petition that initiated the 1986 lawsuit as well as Judge Yates's 1986 order. These exhibits reveal that plaintiff filed her 1986 action seeking to prevent the Department from withdrawing funding to Blare House pursuant to section 2—110 of the Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1985, ch. 91½, par. 2—110), then in force, which provided that an individual could receive "unusual, hazardous, or experimental" treatments upon the consent of the individual's guardian and court approval of that consent. In her petition, plaintiff alleged that CES was determined by experts to be "the most effective means to control Bradley's self-injurious behavior, primarily head banging and head hitting." She further explained that CES is administered using a device called the "Power-Mite," which produces an electric shock which is "somewhat more than would be received by touching a metallic object in a dry environment, and considerably less than the shock received by touching a household 110 volt electronic outlet."

In his order dated May 7, 1986, Judge Yates found that the evidence presented by plaintiff established "that the use of contingent electric shock may be authorized by Bradley Bernstein's guardian in her ward's best interest." In making this determination, the court noted the efforts to control defendant's self-injurious behavior through medication and restraints were ineffective and harmful and that CES could "eliminate the need for physical restraint, and allow Bradley to benefit from less restrictive treatment alternatives." The court also observed:

> "The use of contingent electric shock *** violates neither the Mental Health and Developmental Disabilities Code, Ill. Rev. Stat. Ch. 91½ sec. 1—100 et seq., the Community Residential Alterna-

tives Licensing Act, Ill. Rev. Stat. Ch. 91½, Sec. 621 *et seq.*, the Minimum Standards for Licensure of Community Residential Alternative promulgated by the Department of Mental Health and Developmental Disabilities, nor any other published policy of that department."

The court concluded, however, that "[b]ecause of the intrusive nature of the proposed procedure, it is important that programs implementing the use of shock be professionally conceived and administered, and that high standards of accountability be maintained in an open setting." Accordingly, the court held that CES "can be safely and professionally administered in *** Blare House, provided that adequate steps are taken to insure control and accountability." The court then approved the treatment plan, which set forth detailed procedures for administering CES, but further ordered that the plan be reviewed and approved by behavior management and human rights committees and that the guardian report to the court on a biweekly basis concerning the status of Bradley's treatment. The court also observed and recognized that although the service plan provided for the use of CES, it was "designed to provide for its eventual elimination."

Plaintiff also argued in her response to Trinity's motion to dismiss that section 15f was not applicable to bar the use of CES because the Act provides for an exception to section 15f's proscription of electric shock treatment for those with behavioral challenges. On this point she noted that section 15f states that, to the extent it "conflicts with Article I of Chapter II of the Mental Health and Developmental Disabilities Code, that Article controls." 20 ILCS 1705/15f(d) (West 2006). Plaintiff further observed that under section 2—110 of article I of chapter II of the Code (405 ILCS 5/2—110 (West 2006)), an individual may receive "unusual, hazardous, or experimental" treatments upon the determination of both his guardian and a court that it is in his best interest to receive such treatment. Thus, plaintiff suggested, because section 15f's proscription on the use of electric shock therapy conflicts with section 2—110, which allows the use of "unusual, hazardous, or experimental" treatments with court approval, section 2—110 controls. She claimed that since section 2—110 controls, the adjudication by Judge Yates in 1986 that the use of CES was permissible under section 2—110 is still applicable.

On March 2, 2007, the circuit court granted Trinity's motion to dismiss. In doing so, the court held that Trinity was not required to administer CES pursuant to the 2006 settlement agreement between the parties because section 15f's proscription on electric shock therapy had become effective prior to the agreement being executed and made

the performance of that agreement illegal. With respect to the 1986 consent decree, the court found that section 15f was a procedural law and therefore could be applied retroactively to Bradley notwithstanding any rights that may have vested under that order. In its order, the court specifically observed and acknowledged that, as of the time of Judge Yates's order, the use of CES had not been proscribed by any statute or Department regulation. As to plaintiff's claim that CES could be administered under section 2—110, which allows "unusual, hazardous, or experimental" treatments with court approval, the court found that the legislature clearly intended to prohibit electric shock therapy and noted that if the legislature had wanted to approve such forms of treatment subject to court order, it could have done so, but did not.

On March 30, 2007, plaintiff filed a motion to reconsider the order granting Trinity's motion to dismiss arguing, in part, that the court erred in determining that section 15f was a procedural law and thus could be applied retroactively to prohibit the use of CES on Bradley despite the 1986 Judge Yates order. On June 20, 2007, the circuit court denied the motion. In doing so, the court altered its earlier decision by concluding that section 15f was a substantive, not a procedural, law that could not be applied retroactively. It nevertheless concluded that Bradley had no vested right to continued treatment by CES under Judge Yates's order, because the order did not require Blare House to continue the use of CES, but merely enjoined the Department from interfering with the administration of CES on Bradley. The court also noted that although the consent decree entered by the parties in the 1986 litigation acknowledged that CES was the most effective treatment for Bradley, this did not create a vested right for Bradley to receive CES. After denying the motion to reconsider, the court granted plaintiff leave to file an amended complaint alleging the unconstitutionality of section 15f.

On June 22, 2007, plaintiff filed her first amended complaint adding the Department as a defendant, apparently having not yet received the court's decision on her motion to reconsider. In amended count I, plaintiff again alleged that Trinity breached the settlement agreement entered between the parties to resolve the 2003 litigation by discontinuing the use of CES on Bradley, subject to the "pending motion to reconsider." In count II, plaintiff sought a declaratory judgment that section 15f was unconstitutional because it "constitutes an unconstitutional deprivation of and substantive due process violation of Bradley's right to live in the least restrictive environment and deprives Bradley of a fundamental liberty and/or life interest by eliminating the only treatment found that controls Bradley's self

injurious behavior, to wit, contingent electric shock." In count III, plaintiff sought a permanent injunction enjoining the defendants from prohibiting the use of electric shock on Bradley.

Trinity and the Department filed separate motions to dismiss the amended complaint pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 2006)) arguing that Bradley had no right to receive a particular form of treatment and thus plaintiff failed to state a claim that section 15f was unconstitutional. The court agreed and entered an order on October 4, 2007, dismissing plaintiff's amended complaint. In doing so, the court concluded that "Bradley has a liberty interest in receiving adequate and humane care pursuant to an individualized service plan," citing the Illinois Supreme Court's decision in *Dixon Ass'n for Retarded Citizens v. Thompson*, 91 Ill. 2d 518, 440 N.E.2d 117 (1982). It nevertheless concluded that "Bradley's right is the right that each individual possesses to adequate, safe, humane, and non-aversive treatment. His right is not to a particular treatment." The court determined that the case did not involve a fundamental right and proceeded to determine that section 15f did not violate Bradley's substantive due process rights under the rational basis test. The court also dismissed plaintiff's claim for breach of contract (count I) because "Trinity cannot legally administer CES as part of Bradley's treatment" and her claim for a permanent injunction enjoining Trinity and the Department from preventing the use of CES on Bradley because "Section 15f's prohibition on the use of CES is legal and constitutional."

## II. ANALYSIS

On appeal, plaintiff contends that the circuit court erred in dismissing her amended complaint. She specifically claims that she adequately alleged that Trinity breached the settlement agreement between the parties by terminating its use of CES to treat Bradley, that section 15f of the Mental Health and Developmental Disabilities Administrative Act (20 ILCS 1705/15f (West 2006)) unconstitutionally deprived Bradley of his vested right to receive adequate and humane services in the least restrictive environment, and that an injunction forcing Trinity to restart the use of CES was required. When analyzing the propriety of a dismissal under section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 2006)), we accept the allegations in plaintiff's complaint as true and determine whether those allegations, construed in a light most favorable to plaintiff, sufficiently establish a cause of action upon which relief may be granted. *Stroger v. Regional Transportation Authority*, 201 Ill. 2d 508, 516, 778 N.E.2d 683, 688 (2002). When analyzing the propriety of a dismissal under

section 2—619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2—619(a)(9) (West 2006)), we must assume the legal sufficiency of plaintiff's cause of action but determine whether plaintiff's cause is defeated by an affirmative matter avoiding the legal effect of the claim. *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 115-16, 619 N.E.2d 732, 735 (1993). We review an order granting a motion to dismiss under either section *de novo. Compton v. Country Mutual Insurance Co.*, 382 Ill. App. 3d 323, 325, 887 N.E.2d 878, 882 (2008); *Hodge*, 156 Ill. 2d at 116, 619 N.E.2d at 735.

Plaintiff first claims that the circuit court erred in dismissing her claim for breach of contract. Although she apparently concedes that the performance of a contract cannot be compelled if such performance would violate a statute (*Braye v. Archer-Daniels-Midland Co.*, 175 Ill. 2d 201, 215, 676 N.E.2d 1295, 1303 (1997)), plaintiff nevertheless contends that section 15f's proscription on the use of electric shock for the care of mentally ill patients with behavioral problems is inapplicable in this case because the Code has created an exception to the general proscription, the application of section 15f in this case would violate Bradley's rights to substantive due process, and the application of section 15f would impermissibly eviscerate Bradley's "vested right" to receive adequate treatment in the least restrictive environment. We will examine each of these arguments in turn.

■ The resolution of plaintiff's first claim, that section 15f does not ban the treatment of Bradley with electric shock in this case, turns on the analysis of two statutes. The first of these statutes is section 15f of the Mental Health and Developmental Disabilities Administrative Act (405 ILCS 1705/15f (West 2006)) and specifically the second paragraph of subsection (b) thereof. Section 15f provides in pertinent part:

"(a) As used in this Section:

'Behavioral challenges' means episodes of significant property destruction, self-injurious behavior, assaultive behavior, or any other behavior that prevents a person from successful participation in a Home and Community Based Services Program for Persons with Developmental Disabilities, as determined by the community support team.

\*\*\*

(b) Each individual participating in a Home and Community Based Services Program for Persons with Developmental Disabilities, regardless of whether the individual is eligible for federal financial participation for these services, who exhibits behavioral challenges shall have an individualized behavioral support plan. Each individualized support plan shall: (i) be designed to meet

individual needs; (ii) be in the immediate and long-term best interests of the individual; (iii) be non-aversive; (iv) teach the individual new skills; (v) provide alternatives to behavioral challenges; (vi) offer opportunities for choice and social integration; and (vii) allow for environmental modifications. The plan must be based on a functional behavioral assessment conducted by a professional trained in its use. The plan shall be implemented by staff who have been trained in and are qualified to effectively apply positive non-aversive intervention. All behavioral supports required by the plan shall be applied in a humane and caring manner that respects the dignity of the individual and shall be implemented in a positive and socially supportive environment, including the home.

*Interventions must not: (1) include electric shock; (2) withhold essential food and drink; (3) cause physical or psychological pain; (4) use drugs as restraints; or (5) produce humiliation or discomfort.*

Nothing in this subsection shall preclude, for therapeutic purposes, variant scheduling of food or drink or the application of safe and appropriate time-out procedures.

\*\*\*

(d) To the extent this Section conflicts with Article I of Chapter II of the Mental Health and Developmental Disabilities Code, that Article controls." (Emphasis added.) 20 ILCS 1705/15f (West 2006).

■ The second statute at issue is section 2—110 of the Mental Health and Developmental Disabilities Code, which states:

"No recipient of services shall be subjected to any unusual, hazardous, or experimental services or psychosurgery, without his written and informed consent.

If the recipient is a minor or is under guardianship, such recipient's parent or guardian is authorized, only with the approval of the court, to provide informed consent for participation of the ward in any such services which the guardian deems to be in the best interests of the ward." 405 ILCS 5/2—110 (West 2006).

■ Plaintiff argues that these two statutes, when read together, allow for the use of electric shock treatment on Bradley. Plaintiff contends that while section 15f explicitly provides that individualized behavioral plans for mental ill individuals with behavioral challenges cannot include aversive treatments such as electric shock (20 ILCS 1705/15f(b) (West 2006)), it also states that to the extent the section "conflicts with Article I of Chapter II of the Mental Health and Developmental Disabilities Code, that Article controls" (20 ILCS 1705/15f(d) (West 2006)). Turning to article I of chapter II of the Code, plaintiff then cites section 2—110, which states that a mentally ill individual can receive "unusual, hazardous, or experimental services" upon court approval of his guardian's consent to that treatment. 405

ILCS 5/2—110 (West 2006). Plaintiff notes that article I of chapter II of the Code contains provisions allowing for treatment by psychotropic medications and electroconvulsive therapy with court approval (405 ILCS 5/2—107.1 (West 2006)), the use of physical restraints upon the written order of a medical professional (405 ILCS 5/2—108(a) (West 2006)), and the use of forced seclusion upon the written order of a medical professional (405 ILCS 5/2—109(a) (West 2006)). She contends that aversive therapy such as electric shock is encompassed within the scope of section 2—110 of article I of chapter II of the Code, which allows "unusual, hazardous, or experimental" treatments upon the approval of his guardian and a court, and thus section 2—110 controls over section 15f. Plaintiff therefore claims that the performance of the settlement agreement would not be illegal and thus would still be enforceable, arguing that Judge Yates's approval of the use of CES on Bradley in his 1986 order pursuant to section 2—110 must still control since it is compatible with section 15f's ban on the use of electric shock treatments.

Questions of statutory interpretation such as the one presented here are questions of law and are reviewed *de novo*. *In re Application of the County Collector*, 265 Ill. App. 3d 485, 490, 637 N.E.2d 679, 683 (1994). In conducting such analysis our primary goal is to give effect to the true intent of the legislature. *Hernon v. E.W. Corrigan Construction Co.*, 149 Ill. 2d 190, 194, 595 N.E.2d 561, 563 (1992). Because the text of the statute itself is considered the surest reflection of that intent, where statutory language is clear, courts must give it effect as written without recourse to outside sources of interpretation. *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 81, 630 N.E.2d 820, 822 (1994). Where, however, statutory language is ambiguous, courts may look beyond the language to consider the policy motivating the statute. *Solich*, 158 Ill. 2d at 81, 630 N.E.2d at 822. When we engage in statutory interpretation, "[t]he statute should be evaluated as a whole, with each provision construed in connection with every other section." *Paris v. Feder*, 179 Ill. 2d 173, 177, 688 N.E.2d 137, 140 (1997). "Statutes should, if possible, be construed so that no term is rendered superfluous or meaningless." *Niven v. Siqueira*, 109 Ill. 2d 357, 365, 487 N.E.2d 937, 942 (1985).

Turning to the statutes at issue in this case, we first note that section 2—110, which plaintiff contends permits the use of CES despite the explicit language of section 15f barring the use of electric shock treatment, has been held facially unconstitutional by the Fourth District of this court in the case *In re Branning*, 285 Ill. App. 3d 405, 674 N.E.2d 463 (1996). In that case, the State appealed an order granting the petition filed by the guardian of an incompetent individual

named Winifred Branning seeking court approval for the use of electroconvulsive therapy on Branning. *Branning*, 285 Ill. App. 3d at 408, 674 N.E.2d at 466. In holding that the portion of section 2—110 which allows the treatment of a mentally incompetent individual with "unusual, hazardous, or experimental" services upon court approval of the guardian's consent, the court noted that the ward has a significant liberty interest in refusing unwanted electroconvulsive therapy. *Branning*, 285 Ill. App. 3d at 411, 674 N.E.2d at 468. The court also found that although the State had a sufficiently compelling interest in providing individuals "who are without the capacity to make reasoned decisions regarding their need for treatment due to a serious mental illness or developmental disability" to overcome the individual's right to refuse "unwanted treatments of the type section 2—110 of the Code authorizes," this interest would not be served unless the individual who is being provided with such treatment is in fact "unable to make a rational decision for himself regarding treatment." *Branning*, 285 Ill. App. 3d at 412, 674 N.E.2d at 468. Because section 2—110 contains no provision requiring proof be presented that an individual is unable to make a rational decision regarding treatment before the "unusual, hazardous, or experimental" treatment is administered, the court held that the statute violates an individual's right to procedural due process. *Branning*, 285 Ill. App. 3d at 412-13, 674 N.E.2d at 468-69. We find no reason to disagree with the analysis of the Fourth District on this point and reject plaintiff's reliance on section 2—110.

Moreover, even if section 2—110 were constitutional, it is arguable that it would not authorize the use of CES on Bradley in light of section 15f's proscription on the use of electric shock therapy. Plaintiff asserts, as noted above, that while section 15f explicitly states that mentally disabled individuals who suffer from behavioral challenges may not be treated with electric shock (20 ILCS 1705/15f(b) (West 2006)), the statute has no effect to bar the use of CES on Bradley, because it is trumped by section 2—110, which allows the use of CES as an "unusual, hazardous, or experimental" treatment. In support of this claim, plaintiff observes that section 2—110 is a provision of article I of chapter II of the Mental Health and Developmental Disabilities Code and that section 15f provides that "[t]o the extent this Section conflicts with article I of chapter II of the Mental Health and Developmental Disabilities Code, that Article controls." 20 ILCS 1705/15f(d) (West 2006). We observe, however, that if the legislature had intended to allow the use of electric shock treatment as an "unusual, hazardous, or experimental" treatment with court approval, as plaintiff suggests, it would have had no need to enact the intervention

bar under subsection (b) of section 15f because section 2—110 would still fully control such interventions and would therefore render the bar to interventions redundant and superfluous.

Furthermore, we note that the purpose of section 15f, by its own terms, is to ensure that those receiving interventions for behavioral challenges be treated in a "humane and caring manner that respects the dignity of the individual." 20 ILCS 1705/15f(b) (West 2006). Thus, arguably the prohibition of electric shock treatments under section 15f need not be viewed as conflicting with the provisions of section 2—110 which permit, on a regulated basis, the use of treatments that are "unusual, hazardous, or experimental." Argument can be made that section 15f does not prohibit the use of electric shock by reason of it being "unusual, hazardous, or experimental," but because it is cruel and inhumane, an aspect which section 2—110 does not purport to address.

■ Plaintiff next claims that even if section 2—110 is unavailing to modify the import of section 15f of the Mental Health and Developmental Disabilities Administrative Act (20 ILCS 1705/15f(b) (West 2006)), section 15f should not be applied to defeat her breach of contract claim because such an application would violate Bradley's "substantive due process right to life and liberty by denying him the means to realize his right to live in the least restrictive environment possible." Although plaintiff does not specifically explain this claim, it appears that she is arguing that the termination of CES due to the passage of section 15f has forced Trinity to use physical restraints and chemicals to control his behavior, which do not control his self-injurious behavior as effectively and therefore preclude him from taking part in social, recreational, and vocational activities. In her complaint, plaintiff alleges that "[w]ithout contingent electric shock Bradley is being denied all forms of employment, social activity and integration with the community because Bradley's staff no longer has any effective means to control his self injurious and aggressive behaviors."

In support of her argument, plaintiff cites the United States Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982). In *Youngberg*, the Court considered a lawsuit filed pursuant to section 1983 of the Civil Rights Act (42 U.S.C. §1983 (1982)) by the mother of a patient who had been involuntarily committed to a Pennsylvania state institution for the mentally retarded. *Youngberg*, 457 U.S. at 309, 73 L. Ed. 2d at 32-33, 102 S. Ct. at 2454-55. She alleged that her son was injured on numerous occasions because those who operated the facility failed to institute appropriate procedures to prevent the injuries after they knew or should have known that the injuries were occurring. *Youngberg*, 457

U.S. at 310, 73 L. Ed. 2d at 33-34, 102 S. Ct. at 2455. Plaintiff later filed a second amended complaint alleging that the defendants were restraining her son for prolonged periods on a routine basis and seeking damages for the defendant's failure to provide her son with appropriate " 'treatment or programs for his mental retardation.' " *Youngberg*, 457 U.S. at 311, 73 L. Ed. 2d at 34, 102 S. Ct. at 2455. In making these claims, plaintiff argued that a patient who is involuntarily committed to a state institution has substantive rights under the due process clause to safe conditions of confinement, freedom from bodily restraints, and training or "habilitation" while committed to the institution. *Youngberg*, 457 U.S. at 309, 73 L. Ed. 2d at 32-33, 102 S. Ct. at 2454. The Court agreed.

In doing so, the Court noted that the respondent's first two claims, regarding the right to safe conditions of confinement and freedom from bodily restraints had been recognized by the Court on previous occasions and that involuntarily committed patients were entitled to those rights. *Youngberg*, 457 U.S. at 315-16, 73 L. Ed. 2d at 37, 102 S. Ct. at 2458. Turning to its analysis of the respondent's third claim, that her son had a right to "habilitation," or the " 'training and development of needed skills' " for dealing with his mental retardation, the Court started its analysis by noting the "established principles" that "a State is under no constitutional duty to provide substantive services for those within its border" and that "[w]hen a person is institutionalized—and wholly dependant on the State— *** a duty to provide certain services and care does exist, although even then a State necessarily has considerable discretion in determining the nature and scope of its responsibilities." *Youngberg*, 457 U.S. at 317, 73 L. Ed. 2d at 38, 102 S. Ct. at 2458-59. The Court continued by holding that the liberty interests of respondent's son required "the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Youngberg*, 457 U.S. at 319, 73 L. Ed. 2d at 39, 102 S. Ct. at 2460.

Although the Supreme Court in *Youngberg* held that individuals who are involuntarily admitted into the care of the State have liberty interests in safe conditions, freedom from unreasonable restraints, and access to minimal training to promote their safety and freedom from unreasonable restraints, the Court did not hold that a patient who is voluntarily admitted to a private facility, such as Bradley, possesses such rights. To the contrary, the Court began its analysis by noting that its analysis started with the "established principles" that a state generally has no constitutional duty to provide substantive services for those within its border but that a duty to provide certain services and care does exist when an individual is institutionalized

and becomes wholly dependant on the State. *Youngberg*, 457 U.S. at 317, 73 L. Ed. 2d at 38, 102 S. Ct. at 2459.

Indeed, in a subsequent decision holding that a state has no affirmative duty to protect a child from abuse at the hands of his father after learning of that abuse, the Supreme Court observed:

"[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text. Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression,' [citations]. Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes." *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 195-96, 103 L. Ed. 2d 249, 258-59, 109 S. Ct. 998, 1003 (1989).

The Court then noted that although it had acknowledged in previous decisions, including *Youngberg*, that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals" (*DeShaney*, 489 U.S. at 198, 103 L. Ed. 2d at 260, 109 S. Ct. at 1004), those cases taken together stood "only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being" (*DeShaney*, 489 U.S. at 199-200, 103 L. Ed. 2d at 261, 109 S. Ct. at 1005). The Court explained:

"The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. [Citations.] The affirmative duty to protect arises not from the State's knowledge of the

individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. [Citation.] In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *DeShaney*, 489 U.S. at 200, 103 L. Ed. 2d at 261-62, 109 S. Ct. at 1005 (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04, 50 L. Ed. 2d 251, 259-60, 97 S. Ct. 285, 290-91 (1976), and *Youngberg*, 457 U.S. at 315-16, 73 L. Ed. 2d at 37-38, 102 S. Ct. at 2457-58).

Indeed, we note that, while the holding of *Youngberg* has been extended to cover individuals who are involuntarily committed by the State and placed in a private facility or home (*Yvonne L. v. New Mexico Department of Human Services*, 959 F.2d 883, 892 (10th Cir. 1992) (children in care of State had due process right to being placed in safe child care facility); *K.H. v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990) (child taken from abusive family and placed in government protection had due process right to being placed in safe foster home); *Doe v. New York City Department of Social Services*, 649 F.2d 134, 141 (2d Cir. 1981) (same)), we are aware of no court that has extended the decision to vest a voluntary resident of a private facility, such as Bradley, with the liberty interests provided in *Youngberg*. Indeed, we note that courts have reached the opposite conclusion. *Hanson v. Clarke County, Iowa*, 867 F.2d 1115, 1120 (8th Cir. 1989) (voluntarily institutionalized patient had no substantive due process rights under *Youngberg*); *Phillips v. Thompson*, 715 F.2d 365, 367 (7th Cir. 1983) (patients voluntarily admitted to state facility possessed no substantive due process right under the fourteenth amendment to care in a community residential setting); *Monahan v. Dorchester Counseling Center, Inc.*, 770 F. Supp. 43, 46-47 (D. Mass. 1991) (because State's affirmative duty to protect individual arises only when it takes custody of that individual, state has no constitutional obligation to provide care to an individual voluntarily admitted to state mental health facility); *Gieseking v. Schafer*, 672 F. Supp. 1249, 1266 (W.D. Mo. 1987) (mentally disabled individual had no due process liberty interest in being in treatment in least restrictive environment under *Youngberg* because he was admitted voluntarily).

Furthermore, even if Bradley were an involuntary admitted patient, plaintiff does not claim that the enactment of section 15f violated any of the specific due process rights articulated by the *Young-*

*berg* Court, namely, the rights to safe conditions provided by the State, freedom from unreasonable restraints by the State, and access to minimal training to promote those interests. *Youngberg*, 457 U.S. at 315-19, 73 L. Ed. 2d at 36-39, 102 S. Ct. at 2458-60. The *Youngberg* Court did not suggest that a mentally disabled individual in the custody of the State possesses a liberty interest in receiving optimal courses of treatment or to the recognition and application of a controversial treatment. In fact, the so-called constitutional interest of which plaintiff claims to be deprived, the right to receive "adequate and humane care and services in the least restrictive environment," is not a paraphrase of the constitutional standard, but rather the statutory standard imposed by section 2—102 of the Mental Health and Developmental Disabilities Code, which states that "[a] recipient of services shall be provided with adequate and humane care and services in the least restrictive environment, pursuant to an individual services plan." 405 ILCS 5/2—102(a) (West 2006). This statutory standard is by no means coextensive with the constitutional standards recognized in *Youngberg*. We find no authority for the proposition that such a right arises independently from the due process clause as plaintiff appears to suggest. In fact, numerous courts have found to the contrary. See *Hanson v. Clarke County, Iowa*, 867 F.2d 1115, 1120 (8th Cir. 1989) (although mentally disabled individual had statutory right to receive "appropriate care and treatment," she did not possess "a liberty interest protected by the due process clause of the fourteenth amendment to the United States Constitution in being placed in an environment that is no more restrictive than is considered appropriate by 'qualified professionals' "); *Lelsz v. Kavanagh*, 807 F.2d 1243, 1251 (5th Cir. 1987) (State not required to treat mentally ill individuals in least restrictive environment because "federal constitution does not confer *** right to habilitation in the least restrictive environment"); *Phillips v. Thompson*, 715 F.2d 365, 367 (7th Cir. 1983), quoting *Youngberg*, 457 U.S. at 317, 73 L. Ed. 2d at 38, 102 S. Ct. at 2459 (State had no obligation to provide mentally disabled patients of state mental health facility with placement in a less restrictive community residential setting because " '[a]s a general matter, a State is under no constitutional duty to provide substantive services for those within its borders' "); *Gieseking v. Schafer*, 672 F. Supp. 1249, 1266 (W.D. Mo. 1987) (mentally disabled individuals had no due process right to community placement based on fact that medical professionals recommended such placement because "the courts have uniformly rejected the notion that mentally retarded and developmentally disabled individuals have a constitutionally-founded right to receive treatment in the least restrictive alternative"). We further note that Bradley's

statutory right to "adequate and humane care and services in the least restrictive environment" (405 ILCS 5/102(a) (West 2006)) is limited by the legislature's enactment of section 15f of the Mental Health and Developmental Disabilities Administrative Act (20 ILCS 1705/15f(b) (West 2006)), which explicitly prohibits electric shock treatment and implicitly excludes such treatment from the phrase "adequate and humane care" for those with behavioral challenges.

In reaching this conclusion, we disagree with the circuit court's holding that the Illinois Supreme Court's decision in *Dixon Ass'n for Retarded Citizens v. Thompson*, 91 Ill. 2d 518, 440 N.E.2d 117 (1982), supports the proposition that "Bradley has a liberty interest in receiving adequate and humane care pursuant to an individual service plan." In *Dixon*, residents of the Dixon Developmental Center filed a lawsuit seeking to enjoin the State of Illinois from closing their facility and transferring them to other facilities. *Dixon*, 91 Ill. 2d at 521-22, 440 N.E.2d at 119. In support of their action, the residents argued that such actions would violate their statutory rights to "adequate and humane care and services" under section 2—102(a) of the Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1981, ch. 91½, par. 2—102(a)) and the transfer procedures set forth in section 4—707 (Ill. Rev. Stat. 1981, ch. 91½, par. 4—707), as well as their constitutional due process rights. *Dixon*, 91 Ill. 2d at 522-23, 440 N.E.2d at 119. In granting the preliminary injunction, the circuit court relied only on the plaintiffs' statutory rights and consequently, the supreme court limited its analysis to the residents' statutory claims, holding "[w]e need not address alleged violations of the residents' constitutional rights, other than to say that the statutory rights granted under the Code are more expansive than and include the constitutional rights of the Dixon residents." *Dixon*, 91 Ill. 2d at 523, 440 N.E.2d at 119. Furthermore, there is no indication in *Dixon* that the facility was a private facility or that its residents were there voluntarily, as is the case for Bradley.[1] Therefore, *Dixon* does not stand for the proposition that a voluntary resident of a private institution

---

[1]On this point, we note that the Dixon Developmental Center has been described as a State facility in previous cases (*Mixen v. State*, 41 Ill. Ct. Cl. 114, 115 (1988) (describing Dixon Developmental Center as the State's "institutional facility for the disabled and handicapped at Dixon, Illinois")); *Quinn v. State*, 39 Ill. Ct. Cl. 126, 126 (1987) (describing Dixon Developmental Center as "an Illinois Department of Mental Health and Developmental Disabilities facility") and was listed as an institution "acquired or created under the jurisdiction of the Department" in the 1981 Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1981, ch. 91½, par. 100—4).

has a substantive due process right to "adequate and humane care and services in the least restrictive environment."

■ Plaintiff next contends that even if section 15f is now in force, Bradley nevertheless retains his right to receive CES under Judge Yates's 1986 order pursuant to the principle that when a statutory right is implemented in a court decree, that statutory right vests and cannot be preempted by subsequent statutory enactments. In support of this claim, she cites the single case of *People ex rel. Allied Bridge & Construction Co. v. McKibbin*, 380 Ill. 63, 43 N.E.2d 550 (1942). In response, defendants agree that section 15f cannot be applied retroactively, but deny that any such retroactive application is essential to enforce the provisions of section 15f in this case—a position with which we agree.

We find the decision in *McKibbin*, upon which plaintiff relies, to be inapposite. In that case, various construction businesses received a court order directing the Director of Finance of the State of Illinois to issue credit memoranda for overpaid assessments which could be used to offset future assessments, but could not be redeemed for cash. *McKibbin*, 380 Ill. at 64, 43 N.E.2d at 551. The order also stated that the credit memoranda were assignable upon application to the department for the proper transfer forms. *McKibbin*, 380 Ill. at 66, 43 N.E.2d at 551-52. Thereafter, the businesses requested transfer forms from the Department, but the Department refused to provide the forms because, after issuing the memoranda, it had enacted a rule barring the transfer of credit memoranda. *McKibbin*, 380 Ill. at 64-66, 43 N.E.2d at 551. The businesses sued and the supreme court issued a writ of *mandamus* compelling them to provide the transfer forms. *McKibbin*, 380 Ill. at 67, 43 N.E.2d at 552. In doing so, the court noted that the prior court order that permitted the transfer was the law of the case and was "*res judicata* as to their rights to assign or transfer these credit memoranda." *McKibbin*, 380 Ill. at 66, 43 N.E.2d at 552. Therefore, the court held, although "generally there is no vested right in a public law," when "rights which arise under a statute are decreed by a court of competent jurisdiction, the rights decreed are vested" and could not be affected by subsequent legislation, such as the Department's regulation barring the transfer of credit memoranda as illegal. *McKibbin*, 380 Ill. at 66-67, 43 N.E.2d at 552.

In this case, unlike the petitioners in *McKibbin* who had a vested right to assign their respective credit memoranda under a previous court order, Bradley had no vested right to receive CES. We note that although Judge Yates approved the use of CES on Bradley as an "unusual, hazardous, or experimental" treatment under section 2—110 of the Mental Health and Developmental Disabilities Code

(then Ill. Rev. Stat. 1985, ch. 91½, par. 2—110) and enjoined the Department from eliminating its funding of that treatment, that order did not vest Bradley with a right to CES into perpetuity. A change in law occurring between two successive causes of action on the same subject matter renders *res judicata* inapplicable (*Statler v. Catalano*, 293 Ill. App. 3d 483, 486, 691 N.E.2d 384, 386 (1997)) as do intervening changes of fact (*Dowrick v. Village of Downers Grove*, 362 Ill. App. 3d 512, 517, 840 N.E.2d 785, 791 (2005)). In his order, Judge Yates held that "the use of contingent electric shock may be authorized by Bradley Bernstein's guardian in her ward's best interest," but ordered that the administration of CES be subject to an individual residential service plan which would be periodically reviewed by the court, noting that although the service plan provided for the use of CES, it was "designed to provide for its eventual elimination." The most recent service plan, implemented pursuant to the 1986 decree, specifically provided that although CES could be used, the treatment was to be ultimately eliminated and reintroduced only "to the extent permitted by law." Judge Yates's ruling was also premised, in part, on the fact that aversion therapy such as CES was not then proscribed by statute. Thus, the decree entered did not by any means purport to be of any permanent duration or insusceptible to changes in either the law or recognized methods of treatment.

Moreover, argument can further be made that the parties terminated the effect of the 1986 decree when they entered into the settlement agreement in 2006 and replaced the terms of the old decree. As previously noted, the settlement agreement was entered into after the enactment of section 15f and thus section 15f need not be given retroactive effect to eviscerate the continued use of CES under the settlement agreement since that agreement was already subject to section 15f when it was entered into.

■ Lastly, we briefly address whether the enactment of section 15f barring the use of electric shock treatment for mentally disabled individuals with behavioral challenges violated the separation of powers doctrine in so far as it interacts with the operation of Judge Yates's 1986 order. Although the parties did not raise this issue, this court requested briefs from the parties on the matter and those briefs were filed. As the Illinois Supreme Court has noted, " '[t]he legislative, executive and judicial branches are separate' " and " '[n]o branch shall exercise powers properly belonging to another.' " *Roth v. Yackley*, 77 Ill. 2d 423, 429, 396 N.E.2d 520, 522 (1979) (quoting Ill. Const. 1970, art. II, §1, and citing *Federal Express Corp. v. Skelton*, 265 Ark. 187, 199, 578 S.W.2d 1, 7-8 (1979), *Johnson v. Morris*, 87 Wash. 2d 922, 926, 557 P.2d 1299, 1303 (1976), and 1A C. Sands, Sutherland on

Statutory Construction §27.04 (4th ed. 1972)). The legislature has the power to draft legislation and thereby "establish laws prospectively" or "alter for future cases interpretations of statutes by reviewing courts." *Roth*, 77 Ill. 2d at 429, 396 N.E.2d at 522. It may not, however, "retroactively alter a statute to overrule a decision of a reviewing court." *In re Marriage of Cohn*, 93 Ill. 2d 190, 203, 443 N.E.2d 541, 547 (1982). To the extent the enactment of 15f interacts with the 1986 order of Judge Yates, the statute did not violate the separation of powers doctrine under the same reasoning that counters plaintiff's contentions regarding the retroactive application of section 15f.

Having rejected plaintiff's contentions that the settlement agreement requiring the continued use of CES until Bradley could be weaned off the treatment was enforceable because such treatment was authorized under section 2—110 of the Mental Health and Developmental Disabilities Code (405 ILCS 5/2—110 (West 2006)) and because the prohibition of section 15f of the Mental Health and Developmental Disabilities Administrative Act (20 ILCS 1705/15f(b) (West 2006)) of the use of electric shock therapy for those with behavioral challenges would violate Bradley's right to substantive due process, we conclude that plaintiff failed to state a claim for breach of the settlement agreement in count I of her amended complaint. Furthermore, consistent with our analysis of plaintiff's constitutional claims above, plaintiff has also failed to state a claim for a declaratory judgment that the application of section 15f to Bradley violated his constitutional rights in count II. Because plaintiff's request for injunctive relief in count III was premised on the viability of his claims in counts I and II, that count was also properly dismissed by the circuit court.

For all the above stated reasons, the order of the circuit court dismissing plaintiff's amended complaint is affirmed.

Affirmed.

O'MALLEY, P.J., and CAHILL, J., concur.